OPINION
{¶ 1} Mentae Humphrey, defendant-appellant, appeals from a judgment of the Franklin County Court of Common Pleas, in which the court found him guilty, pursuant to a jury verdict, of murder with a firearm specification, in violation of R.C. 2903.02, which is a felony of the first degree; aggravated robbery with a firearm specification, in violation of R.C. 2911.01, which is a felony of the first degree; attempted murder with a firearm specification, in violation of R.C. 2923.02 as it related to R.C. 2903.02, which is a felony of the first degree; and improperly discharging a firearm at or into a habitation or school *Page 2 
safety zone with a firearm specification, in violation of R.C. 2923.161, a felony of the second degree.
 {¶ 2} On April 13, 2006, Kenyatta Banks and Javon Redman were playing football with friends. A person approached them seeking to sell a handgun. The person hid the gun in a bush and played football with the others. During this time, Kenyatta called appellant and told him that there was a gun in the bushes that he could steal in exchange for $30.
 {¶ 3} Later that same day, Juan Munguia and his sister Milagros arrived home after selling food from their parents' taco trailer. While Milagros went to the front door of the home and met their brother Rigoberto, Juan unhooked the taco trailer from a vehicle. Milagros and Rigoberto then heard Juan yelling. Rigoberto ran toward Juan and saw an African-American male fighting with Juan, while another African-American male fled. Rigoberto joined the struggle, and the African-American male shot Juan. While fleeing, the African-American male fired another shot at Milagros, missing her. The bullet hit the Munguia's house.
 {¶ 4} On July 12, 2006, the police received a tip based upon a local television news segment entitled "crimestoppers," which profiled the case. The tipster stated that the person who killed Juan was "Minte." Detective James McCoskey contacted the gang unit which told him that appellant had a similar name and was a suspect, along with Banks, in a robbery in Whitehall, Ohio, which had targeted illegal aliens.
 {¶ 5} In September 2006, McCoskey interviewed Banks and learned about the gun in the bushes on the day of the incident. Banks also stated that he and a friend had been walking to meet appellant to receive the $30 payment for the gun, when he saw *Page 3 
appellant shoot a Hispanic individual and then shoot again at people who had run out of the house. Banks also stated that, the day after the shooting, he spoke with appellant, who said he wanted to sell the gun. Banks called Redman, who arranged to have the gun sold to someone on the opposite side of town later that day. Redman also stated he had been in the area at the time of the shooting, and he saw appellant run toward a taco stand, heard someone yelling in a foreign language, heard gunshots, and saw appellant holding a gun.
 {¶ 6} In September 2006, Rigoberto chose appellant from a photograph array, but he indicated he was not sure if appellant was the person who committed the offenses. Appellant was arrested on October 1, 2006, and was indicted on one count of aggravated murder with a firearm specification, one count of murder with a firearm specification, one count of aggravated robbery with a firearm specification, one count of attempted murder with a firearm specification, and one count of improperly discharging a weapon into or at a habitation or school safety zone with a firearm specification.
 {¶ 7} A jury trial commenced September 5, 2007, after which the jury found appellant guilty of murder, aggravated robbery, attempted murder, and improperly discharging a weapon into or at a habitation or school safety zone, as well as the accompanying firearm specifications. On September 14, 2007, appellant was sentenced to a total incarceration term of 26 years to life. Appellant appeals the judgment of the trial court, asserting the following assignments of error:
 I. The Appellant was Denied a Fair Trial Consistent With The Sixth Amendment By the Admission of Prejudicial Hearsay Testimony.
 II. The Evidence was Insufficient to Support a Finding of Guilt. *Page 4 
 III. The Verdict was Against the Manifest Weight of the Evidence.
 {¶ 8} We will address all three assignments of error together. Appellant argues in his first assignment of error that he was denied a fair trial based upon the admission of prejudicial hearsay testimony. Appellant argues in his second assignment of error that the evidence was insufficient to support a finding of guilt. Appellant argues in his third assignment of error that the verdict was against the manifest weight of the evidence.
 {¶ 9} With regard to appellant's first assignment of error, appellant presents two separate arguments. Appellant first asserts that the trial court erred when it allowed Detective McCoskey to read to the jury the report of an anonymous crimestoppers tip that identified appellant as the shooter. Appellant contends that the testimony constituted hearsay, and by allowing the whole report to be read to the jury, the anonymous tip was not offered solely to explain the detective's actions, but as substantive proof of guilt.
 {¶ 10} The Ohio Rules of Evidence forbid the use of hearsay evidence at trial absent a recognized exception. Evid. R. 802. Hearsay evidence is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). Decisions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. State v. Graham (1979), 58 Ohio St.2d 350, and State v.Lundy (1987), 41 Ohio App.3d 163. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. *Page 5 
 {¶ 11} It is well-established that, where statements are offered into evidence to explain an officer's conduct during the course of investigating a crime, such statements are generally not hearsay.State v. Thomas (1980), 61 Ohio St.2d 223, 232. There are limits, however, to this general rule because of the great potential for abuse and potential confusion to the trier of fact. See State v. Blevins
(1987), 36 Ohio App.3d 147, 149. For example, a prosecutor may attempt to use a police officer's testimony regarding his investigative activities as a pretext to introduce highly prejudicial out-of-court statements, while claiming the statements are being offered merely to explain the police officer's conduct, rather than for their truth. Furthermore, when the statements connect the accused with the crime charged, they should generally be excluded. See State v. Culley (Aug. 31, 1989), Franklin App. No. 89AP-153, citing Blevins. To limit the potential for abuse (1) the conduct to be explained must be relevant, equivocal, and contemporaneous with the out-of-court statements, and (2) the out-of-court statements must meet the standard of Evid. R. 403(A); that is, the evidence must be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, even if it is relevant.Blevins, at 149.
 {¶ 12} Here, in his testimony, Detective McCoskey read and/or paraphrased much of the crimestoppers report, which included the tipster's claim that others had stated a male named "Minte" had shot a Mexican victim, as well as the tipster's description of Minte, the surrounding circumstances, and the general location of the incident. Appellant claims that, although mentioning that the crimestoppers tip might have been proper if presented in some limited scope, it was overly prejudicial to have the detective read the entire contents of the report. Other courts have addressed similar situations in which the *Page 6 
contents of a crimestoppers report have been entered as evidence. InState v. Sinkfield (Oct. 2, 1998), Montgomery App. No. 16277, the court found that, although the state claimed that the crimestoppers statement was necessary to explain why the officer placed the defendant's photograph in an array, it was doubtful that the officer's action was so equivocal or ambiguous that it needed to be explained to the jury through the use of the crimestoppers report. The court also found that the probative value of the crimestoppers report was substantially outweighed by the danger of unfair prejudice, because the statement identified the defendant as a suspect. Thus, the court inSinkfield concluded that the trial court abused its discretion by not excluding as hearsay the detective's testimony regarding the anonymous crimestoppers tip.
 {¶ 13} In State v. Stadmire, Cuyahoga App. No. 81188, 2003-Ohio-873, the court reached a conclusion contrary to Sinkfield. InStadmire, the defendant claimed the trial court erred when it allowed the investigating detective to testify as to information he received from a crimestoppers call. The court indicated there was no strict bright-line rule in such circumstances, and Ohio courts routinely hold that testimony concerning the basis or reason for an officer's investigation or subsequent investigative activities is admissible. The court in Stadmire found the evidence admissible because the detective's testimony explained the officer's conduct while investigating a crime, and the case was tried to a judge rather than a jury; thus, the danger of unfair prejudice, if any, was less of a concern.
 {¶ 14} This court has before found testimony involving a crimestoppers tip was inadmissible because it was overly prejudicial. In State v.Faris (Mar. 24, 1994), Franklin App. No. 93APA08-1211, the detective testified that he received a crimestoppers tip that the defendant was responsible for the crime. This court found that the fact the detective *Page 7 
received information from crimestoppers was admissible for foundation purposes; however, the detective continued to testify as to hearsay statements, including that he had received information that the defendant was responsible for the crime. We found this hearsay was not admissible and was unnecessary for foundation purposes. Relying uponBlevins, we stated that, because these statements clearly went to an element of the offense that went toward guilt, and there was little need to explain in such detail why the police began investigating the defendant, the statements should be excluded.
 {¶ 15} In the present case, the tipster reported that appellant shot Juan. Pursuant to Sinkfield and Faris, the probative value of the testimony regarding the crimestoppers report would likely be deemed substantially outweighed by the danger of unfair prejudice, given the statement identified the defendant as a suspect while, pursuant to the holding in Stadmire, the testimony would more likely be deemed admissible. However, we need not determine whether the trial court's admission of Detective McCoskey's testimony here was unfairly prejudicial. Error in criminal proceedings is harmless only if there is no reasonable possibility that the error may have contributed to the accused's conviction. Sinkfield, citing Chapman v. California (1967),386 U.S. 18, 23-24, 87 S.Ct. 824. In order to hold the error harmless, a reviewing court must be able to conclude that the error was harmless beyond a reasonable doubt. Id., citing Chapman, at 24. Error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of the defendant's guilt. Id., citingState v. Williams (1983), 6 Ohio St.3d 281, paragraph six of the syllabus.
 {¶ 16} Although in Sinkfield the trial court found that there was not overwhelming evidence of the defendant's guilt so as to overcome any unfair prejudice, in the present *Page 8 
case, without evidence of the crimestoppers report, there was overwhelming evidence of appellant's guilt. Officer William Edwards testified the suspect was 5'10", skinny, and wore a white ball cap and white t-shirt, consistent with appellant's appearance and the testimony of others. Detective McCoskey testified that he learned that Banks and appellant were suspects in another robbery of Mexicans. He later interviewed Banks, who told him that appellant was involved in the present crime. He also presented a photo array to Rigoberto, who identified appellant as looking like the man who fought with his brother, although he was not sure.
 {¶ 17} Detective McCoskey also talked to Redman about the present crime. Redman testified that he was playing football with Banks, and someone was trying to sell a .22 or .25-caliber chrome gun. The person selling the gun hid it in bushes so he could play football. He stated appellant took the gun from the bushes after Banks called him and told him about it. After the football game, he went home, showered, and started walking to a girl's house. He saw appellant and another male, not Banks, running toward a taco stand parked by a driveway. Someone started yelling in a foreign language, and then others ran out of a house. He then heard three or four gunshots. He saw appellant with a silver .22 or .25-caliber gun, but he did not see him shoot it. However, he later heard appellant bragging about shooting the victim. The day after the shooting, appellant brought him the silver gun and asked him to help sell it. He stated he helped the prosecution by giving them information because, in exchange, the State of Ohio, plaintiff-appellee, recommended probation in another case he was involved in.
 {¶ 18} Banks testified that, in exchange for testifying, the state agreed not to bind him over into adult court in a different case. He stated on the day of the incident, he was *Page 9 
playing football and someone wanted to sell a chrome .25-caliber semi-automatic pistol. The person hid the gun in the bushes, and Banks called appellant to come steal the gun. Appellant arrived, took the gun, and left. After Banks went back home, he spoke to appellant on the phone, and appellant agreed to pay him $30 for the gun. While walking to meet some girls, he talked to appellant on the phone, and appellant told him to meet him on a particular street to receive the $30. Banks started walking in appellant's direction and then saw appellant run toward a house and wrestle with another person. Banks then saw people running out of the house toward appellant, and appellant shot his gun at the group and the person with whom he had been wrestling. The gun appellant shot was the same gun appellant had retrieved from the bushes earlier in the day. Banks ran to meet another friend and then telephoned appellant. Appellant said he had "popped" a Mexican person because the person had a pouch with money in it. He also talked to appellant the next morning, and appellant asked him if he would help him sell the gun. Banks testified he called Redman to get rid of the gun because he knew people in north Columbus, far away from the crime. The three drove to northern Columbus and sold the gun the day after the incident.
 {¶ 19} Heather McClellan, a forensic scientist with the Columbus Police Department, confirmed that the casings found at the scene appeared to be approximately .25 caliber and consistent with a semi-automatic weapon, thus corroborating the testimony of Redman and Banks.
 {¶ 20} Rigoberto testified that, after his sister walked into the house upon arriving with Juan and the taco trailer, he heard Juan shouting from outside. He ran to his brother, who was fighting with two African-American men. One of the African-American men fled. *Page 10 
Juan started to overcome the other man, but the man retrieved a gun from his pants, pointed it at Juan, and shot once at Juan and once at Milagros. The man with the gun was wearing black pants and a white shirt. Milagros testified that, although she did not get a clear view of his face, it was a black male who shot Juan. She corroborated Rigoberto's testimony that the black male was wearing black pants and a white t-shirt. Milagros added that the bullet that appellant fired at her went into their home, entering an interior wall at a height between her chest and head.
 {¶ 21} Rigoberto further testified that, on September 12, 2006, Detective McCoskey showed him a photograph array, and he picked appellant's photograph from the array. He told Detective McCoskey that appellant looked like the person who shot his brother, but he was "not sure," because it was only a small black and white photograph. Rigoberto identified appellant at trial as being the person who shot Juan and was "a hundred percent sure."
 {¶ 22} We find this evidence against appellant was overwhelming. Appellant was identified in a photographic array and in person by Rigoberto as being the assailant. Rigoberto testified that appellant intentionally aimed his gun and shot Juan. Redman and Banks also gave detailed accounts of how appellant acquired the gun, the description of the gun, and appellant's later admissions regarding his murder of Juan. The testimonies of Redman and Banks were consistent with one another. Banks also testified that appellant attempted to rob Juan because he had a pouch with money in it. Both Redman and Banks gave identical accounts of appellant's enlisting them the day following the murder to help him sell the murder weapon. In addition, both Milagros and Rigoberto testified that appellant also shot at Milagros, and the bullet missed her and went into the *Page 11 
house. Thus, we find there was overwhelming evidence that appellant committed murder with a firearm specification, aggravated robbery with a firearm specification, attempted murder with a firearm specification, and improperly discharging a firearm at or into a habitation or school safety zone with a firearm specification. Accordingly, even if the trial court erred by permitting Detective McCoskey to read the contents of the crimestoppers report to the jury, such error was harmless, as there was overwhelming evidence of appellant's guilt, and there was no reasonable possibility that the error contributed to appellant's conviction.
 {¶ 23} Appellant also argues under his first assignment of error that the trial court erred when it allowed the state to introduce other act hearsay evidence, in violation of Evid. R. 404(B) and 403. Specifically, appellant contends Detective McCoskey testified that appellant was a suspect in other robberies targeting illegal Mexicans, and the state was improperly attempting to imply that, because he was a suspect in those robberies, he committed the crimes in the present case.
 {¶ 24} Evid. R. 404(B) provides: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, evidence of other crimes may be admissible as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident under Evid. R. 404(B). Similarly, R.C. 2945.59 provides that:
 In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, *Page 12 
notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.
In order for other acts evidence to be admissible to prove identity through a certain modus operandi, the other acts evidence must be related to and share common features with the crime in question.State v. Lowe (1994), 69 Ohio St.3d 527, paragraph one of the syllabus.
 {¶ 25} In the present case, however, appellant did not object to Detective McCoskey's testimony on this issue. Therefore, he has waived all but plain error on review. State v. Caplinger (1995),105 Ohio App.3d 567, 570-571 (failure to object at the trial court level waives all but plain error upon appeal). Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.State v. Landrum (1990), 53 Ohio St.3d 107, 111. Under the plain error standard, an appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors.State v. Moreland (1990), 50 Ohio St.3d 58, 63.
 {¶ 26} Here, we find no plain error, as appellant has failed to show that the outcome of his trial would have been clearly different but for the alleged error. As explained above, there was overwhelming evidence of his guilt. Furthermore, we find appellant's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. When reviewing the sufficiency of the evidence, an appellate court examines the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in a light most *Page 13 
favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id., citing Jackson v. Virginia (1979), 443 U.S. 307,99 S.Ct. 2781.
 {¶ 27} R.C. 2903.02(B) provides:
 No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.
 {¶ 28} R.C. 2911.01 provides, in pertinent part:
 (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
 * * *
 (3) Inflict, or attempt to inflict, serious physical harm on another.
 {¶ 29} R.C. 2923.02(A) provides:
 No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.
 {¶ 30} R.C. 2923.161 provides, in pertinent part:
 (A) No person, without privilege to do so, shall knowingly do any of the following:
 (1) Discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual[.] *Page 14 
 {¶ 31} With regard to murder, if believed, there was sufficient evidence to demonstrate appellant caused the death of Juan while committing aggravated robbery. Rigoberto testified that appellant intentionally aimed his gun and shot Juan. Redman and Banks also testified that appellant admitted shooting Juan in order to steal money from him. The same evidence, if believed, would also provide sufficient evidence to demonstrate aggravated robbery, in that appellant used a gun to inflict serious physical harm on Juan while attempting a theft offense. Furthermore, there was sufficient evidence, if believed, to demonstrate that appellant purposely and knowingly attempted to cause the death of Milagros. Both Milagros and Rigoberto testified that appellant intentionally shot his gun at Milagros. Milagros and Rigoberto also testified that the bullet appellant fired at Milagros missed her and entered their home, thus satisfying the elements of improper discharge of a firearm at or into a habitation. Clearly all of the gun specifications relating to the above offenses were also supported by sufficient evidence.
 {¶ 32} The jury's verdict was also not against the manifest weight of the evidence. Our function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. In order to undertake this review, we must sit as a "thirteenth juror" and review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. Id., citing State v. Martin (1983), 20 Ohio App.3d 172, 175. If we find that the fact finder clearly lost its way, we must reverse the conviction and order a new trial. Id. On the other hand, we will not reverse a conviction so long as the prosecution presented substantial evidence for a reasonable trier of fact to *Page 15 
conclude that all of the essential elements of the offense were established beyond a reasonable doubt. State v. Getsy (1998),84 Ohio St.3d 180, 193-194; State v. Eley (1978), 56 Ohio St.2d 169, syllabus. In conducting our review, we are guided by the presumption that the jury "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 33} Appellant's contentions herein generally relate to the credibility of the state's witnesses, particularly Redman and Banks. Appellant contends that Redman and Banks are felons and only belatedly came forward to accuse appellant in order to obtain "deals" with the state regarding their own unrelated criminal cases. Appellant points out that both Redman and Banks, in fact, received very favorable sentences for their crimes after cooperating with the prosecution in the present case. Redman received a recommendation from the state for community control after pleading guilty to a lesser-included offense from an aggravated robbery charge, while Banks avoided being bound over to adult court for a robbery offense. Although we agree that both Redman and Banks received favorable recommendations in their respective cases in exchange for testimony against appellant in the present case, and such favorable recommendations could provide incentive for defendants with pending charges to fabricate testimony to obtain a favorable recommendation, appellant has presented no reason for us to second-guess the credibility determinations by the jury. Appellant fails to identify inconsistencies in either of their testimonies, and the testimonies of Banks and Redman are consistent with each other's testimony and that of others. In sum, this court is simply without any reason to find the jury clearly lost its way and created a manifest miscarriage of justice in this respect. *Page 16 
 {¶ 34} Appellant also contends that Rigoberto's statement at the time he identified appellant from a photograph array was equivocal because he stated to police that appellant merely "looks like" the shooter. However, Rigoberto testified that, after seeing appellant in person at trial, instead of in a small black and white photograph, he was 100 percent certain that appellant was the shooter. Furthermore, as the state points out, Rigoberto's uncertainty at the time of his photographic identification may have also been interpreted by the jury as demonstrating Rigoberto's careful and conscientious consideration. Again, we cannot say that the jury lost its way if, in fact, it relied upon Rigoberto's testimony. Therefore, for the above reasons, we find the jury's verdict was based upon sufficient evidence and was not against the manifest weight of the evidence. Appellant's first, second, and third assignments of error are overruled.
 {¶ 35} Accordingly, appellant's first, second, and third assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 McGRATH, P.J., and BRYANT, J., concur. *Page 1