798

The STATE of Ohio, Appellee,

v.

RICKS, Appellant.

[Cite as *State v. Ricks*, 196 Ohio App.3d 798, 2011-Ohio-5043.]

Court of Appeals of Ohio,
Sixth District, Erie County.

No. E–10–022.

Decided Sept. 30, 2011.

Kevin J. Baxer, Erie County Prosecuting Attorney, and Mary Ann Barylski, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Kristopher A. Haines, Assistant Public Defender, for appellant.

_____

PIETRYKOWSKI, Judge.

{¶ 1} Defendant-appellant, Thomas Ricks, appeals the May 4, 2010 judgment entry of the Erie County Court of Common Pleas that, following a jury trial convicting him of aggravated murder, aggravated robbery, complicity to trafficking in marijuana, and complicity to trafficking in cocaine, sentenced appellant to life imprisonment without the possibility of parole plus 26 years. For the reasons that follow, we affirm in part, reverse in part, and remand for resentencing.

{¶ 2} The relevant facts of this case are as follows. On May 9, 2008, appellant was indicted on two counts of aggravated murder, R.C. 2903.01(A) and 2903.01(B), with gun specifications, one count of aggravated robbery, R.C. 2911.01(A)(1), one count of trafficking in marijuana, R.C. 2925.03(A)(1) and 2925.03(C)(3)(c), and one count of trafficking in cocaine, R.C. 2925.03(A)(1) and 2925.03(C)(4)(e). The aggravated-murder charge included a death-penalty specification. R.C. 2929.04(A)(7). The charges stemmed from the March 11, 2008 murder and robbery of Calvin Harper Jr. in Sandusky, Erie County, Ohio. Appellant entered not-guilty pleas to the counts.

{¶ 3} On January 12, 2009, appellant filed a motion to suppress the identification of appellant, by three witnesses, by use of a photo array that he claimed was unduly suggestive. Specifically, appellant argued that the lighting and the angle of his photograph "overtly or subliminally" pointed to him as the suspect. During the April 23, 2009 suppression hearing, it was also discovered that the eyewitnesses knew several of the other individuals placed in the array.

{¶ 4} On June 3, 2009, the trial court denied appellant's motion to suppress. Appellant requested findings of fact and conclusions of law, and on September 30, 2009, the court issued a detailed, 13–page judgment entry that analyzed the identification procedure under the test set forth in *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401. In its entry, the trial court found that the identification procedure was not unduly suggestive and also rejected the argument that the differences in the photo itself made the array unduly suggestive. However, the court found that considering the subtle differences in the photo and because the witnesses knew the other individuals in the array, the array was unduly suggestive. The court ultimately concluded that the reliability of the identifications outweighed any likelihood of misidentification.

{¶ 5} In the interim, on June 25, 2009, appellant filed a motion for court funds to appoint an identification expert. Appellant argued that because identification was a key component in the case, appointment of an expert was necessary to

explain the difficulties inherent in the identification-array procedure. On February 1, 2010, the motion was denied. On April 5, 2010, appellant orally renewed the motion, stating that he had contacted an expert in Ohio who would cost less. On April 12, 2010, the court summarily denied the motion, noting that no new arguments were presented.

{¶ 6} On October 15, 2009, the court granted the state's motion to dismiss the death-penalty specification and to join the two defendants for trial. Appellant opposed the joinder and, on February 1, 2010, separate trials were ordered.

{¶ 7} On April 20, 2010, appellant's jury trial commenced. According to the state's testimony, on March 10, 2008, appellant and his co-defendant, Aaron Gipson, drove down from the Canton, Michigan, area; the two played cards at witness Crystal Harris's apartment with the victim's sister, Chanel Harper. Co-defendant Aaron Gipson was a reputed drug dealer and known to the victim's family and friends.

{¶ 8} Witnesses testified that the victim had a large sum of money in his apartment and planned to purchase drugs from Gipson, a supplier, and then sell the drugs. The victim's neighbor and confidant, Rhonda Farris, testified that between 4:00 and 5:00 p.m., a man she later identified as appellant mistakenly knocked on her door. Farris immediately called Harper to tell him that someone was looking for him. According to Farris, the victim indicated that he was expecting the man. Farris never spoke to the victim again and, the next day, discovered his body.

{¶ 9} Three eyewitnesses identified appellant from a photo array. Farris, as stated above, Crystal Pool, and Chanel Harper each identified appellant as the man with Aaron Gipson on March 10, 2008. All three women knew either a few or all of the other individuals in the photo array.

{¶ 10} The state focused, in depth, on the cellular telephone records of Gipson from March 10 through March 11, 2008. Depending on how rural or urban the area, the records were able to show, within a ten-mile to two-block radius, which cell tower the cell phone was transmitting from. The evidence showed that on March 10, 2008, returning to Canton, Michigan, from Sandusky, Gipson drove north, past the Canton area to the area where appellant had been living, and then proceeded back south to home. On March 11, 2008, prior to proceeding to Sandusky, Gipson again drove north from his home to the area where appellant lived. Further, after the time of Harper's murder, Gipson again went north, then turned back south and went to a casino in Detroit. Appellant did not have a cellular telephone, but there were calls made from Gipson's number to Deotis Sears's cell phone. Sears was appellant's uncle, and he had been living with him.

{¶ 11} There was also testimony that appellant denied knowing Gipson. Further, appellant stated to police that he was living in Atlanta, Georgia (where he was ultimately arrested), and that he had returned to Atlanta on February 19, 2008. However, police found a bus ticket from Michigan to Atlanta dated March 28, 2008. There were also incriminating, though cryptic, statements recorded in jail telephone conversations from appellant to his girlfriend.

{¶ 12} Police testified, over objection, that appellant's co-defendant, Gipson, pointed him out to police while they drove him by where he was residing. Further, appellant's former brother-in-law, Dewon Smith, testified that Aaron Gipson is a friend of the Hicks family and that appellant knew him. Smith testified that on March 10, 2008, Gipson picked up appellant at his home; he returned later that night.

{¶ 13} Following the presentation of evidence, the jury found appellant guilty of aggravated murder, aggravated robbery, and the drug charges. This appeal followed.

{¶ 14} Appellant now raises the following seven assignments of error for our review:

{¶ 15} "Assignment of Error I: The trial court committed reversible error when it allowed into evidence at Mr. Ricks' trial unreliable eyewitness identification evidence, in violation of Mr. Ricks' Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution.

{¶ 16} "Assignment of Error II: The trial court abused its discretion and denied Mr. Ricks the ability to present a complete defense to the State's charges when it denied his motions for a court-appointed expert regarding eyewitness identification, in violation of Mr. Ricks' rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution.

{¶ 17} "Assignment of Error III: Mr. Ricks was denied his right to confront the evidence against him at trial, in violation of his Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

{¶ 18} "Assignment of Error IV: The cumulative nature of the trial court's errors during Mr. Ricks' trial, as presented within Assignments of Error I, II, and III, denied Mr. Ricks' rights to a fair trial and due process of law, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution.

{¶ 19} "Assignment of Error V: The trial court violated Mr. Ricks' rights to due process and a fair trial when, in the absence of sufficient evidence, the trial

court convicted Mr. Ricks of complicity to trafficking in marijuana and complicity to trafficking in cocaine, in violation of Mr. Ricks' Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution.

{¶ 20} "Assignment of Error VI: The trial court committed plain error when it failed to merge the firearm specifications regarding Mr. Ricks' convictions for aggravated murder and aggravated robbery, in violation of R.C. 2929.14(D)(1)(b), and in violation of Mr. Ricks' rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution.

{¶ 21} "Assignment of Error VII: Defense counsel rendered ineffective assistance of counsel in violation of Mr. Ricks' rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution."

{¶ 22} In appellant's first assignment of error, he asserts that the trial court erred in denying his motion to suppress the photo-array identifications where the size and lighting of appellant's photo, combined with the fact that the witnesses knew many of the individuals in the lineup, were so unduly suggestive that the reliability of the identifications could not outweigh the prejudicial effect.

{¶ 23} Initially we note that review of a trial court's grant or denial of a motion to suppress presents mixed questions of law and fact. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. An appellate court defers to a trial court's factual findings made with respect to its ruling on a motion to suppress when the findings are supported by competent, credible evidence. *Id.; State v. Brooks* (1996), 75 Ohio St.3d 148, 154, 661 N.E.2d 1030. "[T]he appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Burnside* at ¶ 8, citing *State v. McNamara* (1997), 124 Ohio App.3d 706, 707, 707 N.E.2d 539.

{¶ 24} The United States Supreme Court has considered due process limitations on the use of evidence derived through suggestive identification procedures. The court used a two-prong analysis: "When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances." *State v. Waddy* (1992), 63 Ohio St.3d 424, 438, 588 N.E.2d 819, superseded by constitutional amendment on other grounds, citing *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401; *Manson v. Brathwaite* (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140. The first question is whether the identification procedure was

unnecessarily suggestive of the defendant's guilt. *Id.* The second is "whether, under all the circumstances, the identification was reliable, *i.e.*, whether suggestive procedures created 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 439, quoting *Simmons v. United States* (1968), 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247.

{¶ 25} On April 23, 2009, a suppression hearing was held. Sandusky Police Detective Gary Wichman testified that after interviewing appellant's co-defendant, Aaron Gipson, in Canton, Michigan, appellant was identified as a suspect in the death of Calvin Harper. A photograph was obtained from Cobb County, Georgia, and was e-mailed to Sandusky County. Using the photograph, a photo array was developed. Appellant's photograph was placed in slot six (out of eight).

{¶ 26} Detective Wichman testified that he was present when the array was shown to two of the three witnesses. Rhonda Farris, the victim's neighbor, was told that the police had a suspect and that he was in the array. Farris identified appellant as the individual who mistakenly knocked on her door just prior to the murder. According to Wichman, Chanel Harper, the victim's sister, identified appellant after she played cards for a few hours with him and Gipson. That was the first occasion she had met appellant.

{¶ 27} During cross-examination, Wichman was questioned regarding the reflection on appellant's face in the photograph. Wichman said that he had not noticed it until defense counsel pointed it out.

{¶ 28} Detective Eric Graybill testified that he compiled the photo array. Graybill stated that in compiling the array, he looked for photographs with similar backgrounds and individuals with similar physical characteristics. Detective Graybill stated that the photographs were selected from those already in the department's system. Graybill said that he did not know where the other individuals in the array lived.

{¶ 29} The three witnesses who identified appellant testified. Crystal Pool testified that on March 10, 2008, she spent a few hours with appellant at her friend's house. That was the first time she had met appellant. Regarding the photo array, Pool admitted that she knew "just about everybody in the picture," but that she recognized appellant, too. Pool testified that she would never forget his eyes.

{¶ 30} Chanel Harper testified that the victim was her brother. Harper stated that Gipson and appellant were at her home on March 10, 2008. Regarding the photo array, Harper testified that she knew "mainly all of" the individuals in the array and went to school with some of them. Harper stated that she was "very sure" of her identification.

{¶ 31} Rhonda Farris testified that she lived next door to the victim and that just before the murder, a man mistakenly knocked on her door. Farris testified that they were approximately six inches apart. Farris testified that she was "very sure" that the individual was appellant, and she picked him out of the photo array. Farris stated that her cousin was in the array and that she knew all the others. Farris stated that she "picked him out first" before she even looked at the other photos.

{¶ 32} Detective Helen Prosowski testified that she presented the photo array with Detective Wichman, separately, to Chanel Harper and Rhonda Farris. It was presented approximately ten days after the murder. Prosowski testified that both women immediately identified appellant.

{¶ 33} As set forth above, the trial court found that the subtle differences in the photograph, combined with the fact that the witnesses knew some or all of the individuals in the array, made the array unduly suggestive. However, the court ultimately concluded that their certainty in identifying appellant combined with the relatively short length of time between the crime and the array negated any likelihood of misidentification.

{¶ 34} Appellant's chief argument is that because the witnesses knew the other individuals in the array, they would, by process of elimination, be more likely to identify appellant as the alleged perpetrator. Ohio courts have not squarely addressed this issue; however, it has been dealt with in other jurisdictions.

{¶ 35} In *State v. Battle* (2008), 312 Wis.2d 481, 751 N.W.2d 903, the victim was shot multiple times by a group of four men, including the appellant. The victim identified appellant from a photo array. Defense counsel moved to suppress the identification. The motion was denied.

{¶ 36} At some point it was revealed that the victim knew all of the people in the six-person photo array. The court concluded that the appellant failed to demonstrate that the array was unduly suggestive. The court noted that the detective did not suggest to the victim who to pick and that the victim immediately recognized and identified the appellant. The court noted that "[t]he fact that [the victim] recognized all of the people depicted in the array from the neighborhood" did not affect the reliability of the identification.

{¶ 37} Similarly, in *State v. Stokes* (Kan.App.2004), 87 P.3d 375, an unknown passenger in a vehicle shot another passenger and stole his money. The victim identified the appellant from a six-person photo array. Though he quickly identified the appellant, he admitted that he knew four of the individuals in the array.

{¶ 38} In its analysis, the court noted that prior to the identification, the detective did not know that the victim knew the other individuals. Further, there

was no evidence that the detective suggested the appellant's photo to the victim. The court concluded that even if the array was suggestive, the identification was reliable.

{¶ 39} Finally, in *People v. James* (1963), 218 Cal.App.2d 166, 32 Cal.Rptr. 283, and *Younger v. Delaware* (Del.1985), 496 A.2d 546, ununiformed police officers were placed in the lineups. Some of the witnesses knew one or more of the individuals. The courts allowed the identifications focusing on the certainty of the identification.

{¶ 40} Appellant also argued that Detective Wichman's statement that a suspect was included in the photo array was unduly suggestive. In *State v. Starks*, 6th Dist. Nos. L–05–1417 and L–05–1419, 2007-Ohio-4897, 2007 WL 2745360, this court noted that a police officer's statement that a suspect was included among those in the array, without more, was not impermissibly suggestive. We noted that "[i]t seems not unreasonable for a witness to assume that any time police show a photo array, one of the pictures there is of an individual of police interest." *Id.* at ¶ 33.

{¶ 41} In the present case, we cannot say that the trial court erred when, despite finding the array unduly suggestive, it denied appellant's motion to suppress the identifications. First, Chanel Harper and Crystal Pool spent an extended period of time with the suspect and were very certain that appellant was the individual with Gipson. Farris, although she only saw appellant for a brief period of time, was also very certain in her identification. The suspect was approximately six inches from her face and it was still light outside. Next, the identification was made within a short period of time. Further, the officers testified that they did not intend to put known individuals in the array and, in fact, only learned of this fact at the hearing. In its September 30, 2009 judgment entry, the court thoroughly addressed all the relevant factors in assessing the reliability of the identification. Thus, under the totality of the circumstances, we find that the identifications were reliable and there was no likelihood of misidentification. Appellant's first assignment of error is not well taken.

{¶ 42} In appellant's second assignment of error, he contends that the trial court erred when it denied his request for a court-appointed identification expert. Specifically, appellant argues that an expert was necessary because the eyewitness identifications were critical in his case due to the lack of physical evidence linking him to the crime. Conversely, the state argues that the case law relied upon by appellant is distinguishable in that multiple witnesses identified appellant and there was additional evidence linking him to the crime. Thus, the jury was capable of assessing the witnesses' ability to observe and remember.

{¶ 43} R.C. 2929.024 requires the trial court to grant funds in aggravated-murder cases for investigative services and experts when "reasonably necessary for the proper representation" of indigent defendants. In *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus, the Supreme Court of Ohio held that due process "requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." See also Evid.R. 702.

{¶ 44} In addition, such testimony is generally admissible only as to factors that may affect the accuracy of a typical, not a particular, eyewitness identification. *State v. Dewitt*, 2d Dist. No. 21620, 2007-Ohio-3437, 2007 WL 1934335, ¶ 67, citing *State v. Buell* (1986), 22 Ohio St.3d 124, 131, 489 N.E.2d 795. This is so because it is the jury's role to assess the credibility of the witness. *Id.* at 132.

{¶ 45} Relied on by appellant, in *State v. Bradley*, 181 Ohio App.3d 40, 2009-Ohio-460, 907 N.E.2d 1205, the court concluded that an eyewitness-identification expert was necessary to the appellant's defense where his identity hinged on the identification of the sole witness and victim, the victim had been subjected to a stressful event, the identification was cross-racial, and the identification was made 30 days after the incident. Similarly, in *State v. Sargent*, 169 Ohio App.3d 679, 2006-Ohio-6823, 864 N.E.2d 155, the victim, robbed at gunpoint, was the sole witness. The court determined that under the circumstances, because the identification may be unreliable, the court abused its discretion in denying the motion for an identification expert. *Id.* at ¶ 13.

{¶ 46} Distinguishing *Bradley*, in *State v. Clark*, 8th Dist. No. 94406, 2010-Ohio-5600, 2010 WL 4684471, the Eighth Appellate District found that the trial court did not abuse its discretion in denying a motion to allow expert testimony. Though a relevancy, not a funding, issue, the court denied the expert, noting that the identification was made just days after the crime and that the identification was not cross-racial. *Id.* at ¶ 23.

{¶ 47} In *State v. Gray*, 8th Dist. No. 92303, 2010-Ohio-240, 2010 WL 320481, although the circumstances of the identification were similar to *Bradley*, and *Sargent*, the court held that the trial court did not err when it denied the defendant's request for an eyewitness-identification expert. Unlike those cases, the court concluded that because there was an abundance of corroborating evidence, there was no reasonable probability that an identification expert would aid in his defense. *Id.* at ¶ 51.

{¶ 48} The present case is distinguishable from *Bradley* and *Sargent* in that the identifications were not made while the eyewitnesses were under stress and they were not cross-racial. In addition, the identifications were made approximately ten days after the murder. Admittedly, unlike *Gray,* there is not a significant amount of corroborating evidence.

{¶ 49} During appellant's trial, the witnesses were thoroughly questioned about their identification of appellant. Chanel Harper testified that she was 100 percent sure that appellant was the individual at her home with Gipson. Harper stated that even though she recognized others in the array, her eyes went directly to appellant's photo. Similarly, Crystal Pool stated that she remembered appellant's eyes and that she was 100 percent sure of her identification. Harper admitted to knowing some of the other people in the array, but stated that it did not affect her certainty that she had correctly identified appellant.

{¶ 50} Rhonda Farris testified that her knowledge of the individuals in the photo array (including her cousin) did not affect her certainty that on March 11, 2008, appellant was the individual who knocked on her door. Farris stated that she did not identify the other individuals in the array until she pointed out appellant.

{¶ 51} At the conclusion of the trial, the court instructed the jury as to the *Neil v. Biggers* factors to consider in weighing the identifying witness testimony. The court stated:

{¶ 52} "Number One. Capacity of the witness, that is, the age, intelligence, defective senses, if any, and the opportunity of the witness to observe.

{¶ 53} "Two. The witness' degree of attention at the time he or she observed the subject.

{¶ 54} "Three. The accuracy of witness' prior description or identification, if any.

{¶ 55} "Four. Whether witness had occasion to observe defendant in the past.

{¶ 56} "Five. The interval of time between the event and the identification.

{¶ 57} "Six. All surrounding circumstances on which witness had identified defendant, including deficiencies, if any, in any lineup, photo display, or one-on-one."

{¶ 58} Based on the foregoing, we cannot say that the trial court abused its discretion when it denied appellant's request for an identification expert. Appellant's second assignment of error is not well taken.

{¶ 59} Appellant's third assignment of error asserts that the trial court denied his right to confront witnesses by allowing, over objection, the introduc-

tion of inculpatory statements by appellant's nontestifying co-defendant. Specifically, appellant objected to testimony that co-defendant Gipson identified him for the police. Conversely, the state contends that the testimony was offered only to explain the officers' conduct during the course of the investigation.

{¶ 60} The testimony at issue was elicited during the direct examination of Canton, Michigan, police officer Michael Steckel. Officer Steckel testified that he was contacted by the Sandusky Police Department regarding shooting suspects Aaron Gipson and an individual nicknamed "Peanut." In order to identify Peanut, Steckel and another officer drove Gipson to Strathmoor Street, on the west side of Detroit, where Gipson said that Peanut lived. Over objection, Steckel stated that Gipson identified Peanut, who was standing in front of the residence.

{¶ 61} Once Gipson identified Peanut, further investigation revealed appellant's name. Steckel testified that they were able to obtain a photograph from another state, which was forwarded to Sandusky. The officers then showed Gipson the photograph of appellant and asked him if it was Peanut. Defense counsel objected, and a bench conference was held. Thereafter, the court issued the following curative instruction:

{¶ 62} "Ladies and gentlemen of the jury, one of the things that you just heard a few seconds ago from the State was—was hearsay, and there's a concern all the time that statements are made outside of Court and that actual person doesn't come into Court and testify and is not subject to cross examination. There are certain exceptions in the law and that deals with the Evidence Rules that I spoke about yesterday, that we have to comply with those rules.

{¶ 63} "Sometimes in allowing in information such as that, information that comes in from someone that (inaudible) testify in open Court, there's a purpose for that, and in this case the evidence about Mr. Gipson going with police detectives and, first off, pointing out a residence; second, pointing out the person on the street known as Peanut, and saying that's Peanut, and then later showing the photograph to Mr. Gipson and him saying that's Mr. Ricks, all those are not for the truth of the matter asserted. In other words, they don't necessarily mean that that was Peanut, that man walking down the street, that that was the residence he lived at or that's the photograph, but they're really brought in for the purpose to explain this officer or that department's investigation, why they were doing what they were doing, and the State has laid a foundation, what was your purpose of going out there and those kinds of things. So understand when you're hearing this testimony that it's to describe this officer and that department's investigation in conjunction with the Sandusky Police Department."

{¶ 64} Questioning continued. Officer Steckel testified that he showed Gipson the photograph of appellant and that Gipson stated it was Peanut. At the close

of the state's case, the state indicated that Gipson was available to testify per defense counsel's request. Counsel stated that after speaking with appellant, they did not wish to call Gipson as a witness.

{¶ 65} Appellant now argues that the testimony regarding what Gipson told police was hearsay and violated his right to confront Gipson on cross-examination. We first note that the admission or exclusion of evidence rests within the sound discretion of the trial court and, therefore, such decisions will not be reversed on appeal absent an abuse of discretion. *State v. Sage* (1987), 31 Ohio St.3d 173, 180, 510 N.E.2d 343.

{¶ 66} In all criminal prosecutions, the defendant has a constitutional right to confront the witnesses against him. *Lilly v. Virginia* (1999), 527 U.S. 116, 123, 119 S.Ct. 1887, 144 L.Ed.2d 117. " 'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' " *Id.* at 123–124, quoting *Maryland v. Craig* (1990), 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666.

{¶ 67} Appellant argues that the trial court's reliance on *State v. Blevins* (1987), 36 Ohio App.3d 147, 521 N.E.2d 1105, in allowing the testimony, was in error. In *Blevins,* the court considered the admissibility of an officer's testimony regarding statements of a drug purchaser. The court concluded that the statements were not hearsay; rather, they were offered to show how the officers came to know the defendant. *Id.* at 149. The court noted that the statements "neither implicated nor cleared defendant." *Id.*

{¶ 68} Following *Blevins,* in *State v. Williams,* 10th Dist. Nos. 02AP–730 and 02AP–731, 2003-Ohio-5204, 2003 WL 22232921, a police officer testified that he stopped a vehicle suspected of being used in a robbery. One of the occupants informed the officer that a family member had used the van earlier that day and revealed the family member's location. *Id.* at ¶ 46. The court concluded that there was no hearsay violation and that the officer's testimony was given to explain his conduct during the course of the investigation. *Id.* at ¶ 49.

{¶ 69} In the present case, we have a co-defendant who identified an individual he believed to be Peanut. There is no evidence that Gipson used the opportunity to exonerate himself and implicate appellant. Once Peanut was identified as appellant, the Sandusky officers were able to compile a photo array. Further, the court issued a lengthy curative instruction to ensure that the jury properly interpreted the testimony. Finally, Gipson was made available for questioning but appellant declined. Based on the foregoing, we find that the trial court did

not err in allowing the testimony. Appellant's third assignment of error is not well taken.

{¶ 70} Appellant's fourth assignment of error contends that based on the cumulative errors set forth above, appellant was denied his right to a fair trial and due process of law. We have stated that "although a particular error by itself may not constitute prejudicial error, the cumulative effect of the errors may deprive a defendant of a fair trial and may warrant the reversal of his conviction." *State v. Hemsley*, 6th Dist. No. WM–02–010, 2003-Ohio-5192, 2003 WL 22233792, ¶ 32, citing *State v. DeMarco* (1987), 31 Ohio St.3d 191, 509 N.E.2d 1256, paragraph two of the syllabus. " 'However, in order even to consider whether "cumulative" error is present, we would first have to find that multiple errors were committed in this case.' " *Hemsley* at ¶ 32, quoting *State v. Madrigal* (2000), 87 Ohio St.3d 378, 398, 721 N.E.2d 52.

{¶ 71} Upon review of appellant's preceding three assignments of error, we cannot say that there were multiple instances of harmless error; accordingly, there can be no cumulative error. Appellant's fourth assignment of error is not well taken.

{¶ 72} In appellant's fifth assignment of error, he argues that his convictions for complicity to trafficking in marijuana and complicity to trafficking in cocaine were not supported by sufficient evidence. In reviewing a claim of sufficiency of the evidence, the relevant inquiry is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found all the essential elements of the crime proven beyond a reasonable doubt. *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560, and *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. "On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (Cook, J., concurring).

{¶ 73} Appellant was convicted of complicity to trafficking in marijuana in the vicinity of a school in an amount greater than 200 grams but less than 1,000 grams, R.C. 2925.03(A)(1) and (C)(3)(c), and 2923.03(A)(2). Appellant was also convicted of complicity to trafficking in cocaine in the vicinity of a school in an amount greater than 100 grams but less than 500 grams, R.C. 2925.03(A)(1) and (C)(4)(e), and 2925.03(A)(2).

{¶ 74} R.C. 2923.03, the complicity statute, provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall do

any of the following: * * * (3) Conspire with another to commit the offense in violation of R.C. 2923.012 of the Revised Code * * *."

{¶ 75} The trafficking statute, R.C. 2925.03, provides:

{¶ 76} "(A) No person shall knowingly do any of the following:

{¶ 77} "(1) Sell or offer to sell a controlled substance;

{¶ 78} " * * *

{¶ 79} "(C) Whoever violates division (A) of this section is guilty of one of the following:

{¶ 80} " * * *

{¶ 81} "(3) If the drug involved in the violation is marihuana or a compound, mixture, preparation, or substance containing marihuana other than hashish, whoever violates division (A) of this section is guilty of trafficking in marihuana. The penalty for the offense shall be determined as follows:

{¶ 82} " * * *

{¶ 83} "(c) Except as otherwise provided in this division, if the amount of the drug involved equals or exceeds two hundred grams but is less than one thousand grams, trafficking in marihuana is a felony of the fourth degree, and division (C) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender. If the amount of the drug involved is within that range and if the offense was committed in the vicinity of a school or in the vicinity of a juvenile, trafficking in marihuana is a felony of the third degree, and division (C) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.

{¶ 84} " * * *

{¶ 85} "(4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of trafficking in cocaine. The penalty for the offense shall be determined as follows:

{¶ 86} " * * *

{¶ 87} "(e) Except as otherwise provided in this division, if the amount of the drug involved equals or exceeds one hundred grams but is less than five hundred grams of cocaine that is not crack cocaine or equals or exceeds ten grams but is less than twenty-five grams of crack cocaine, trafficking in cocaine is a felony of the second degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree. If the amount of the drug involved is within one of those ranges and if the offense was committed in the vicinity of a school or in the vicinity of a juvenile, trafficking in cocaine is a

felony of the first degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the first degree."

{¶ 88} In *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus, the Supreme Court of Ohio held:

{¶ 89} "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime."

{¶ 90} This court has examined Ohio cases where the reviewing court has found sufficient evidence to support a conviction for complicity to drug trafficking. In *State v. McGowan*, 7th Dist. No. 04 JE 6, 2005-Ohio-1335, 2005 WL 678634, the court upheld a conviction where the defendant was driving the drug dealer and, due to a change in location, charged an extra $10 out of the total drug transaction for the extra driving. *Id.* at ¶ 21. Similarly, in *State v. Anderson*, 12th Dist. No. CA2008-07-026, 2009-Ohio-2521, 2009 WL 1515370, the defendant was driving a vehicle in which cocaine and crack cocaine were found. The court found that there was sufficient evidence to support her conviction when testimony was presented to show that she was aware of the drugs in the vehicle and that when stopped by police, she attempted to conceal them. *Id.* at ¶ 30. See *State v. Tapp*, 5th Dist. No. 2006-CAA-090058, 2007-Ohio-2959, 2007 WL 1720501 (sufficient evidence was presented showing that the passenger in a vehicle assisted the seller by making telephone calls and got into the buyer's vehicle).

{¶ 91} Conversely, in *State v. Jordan*, 168 Ohio App.3d 202, 2006-Ohio-538, 859 N.E.2d 563, the court vacated a drug-trafficking conviction, finding that the evidence was insufficient. In *Jordan*, a confidential informant approached the defendant in a convenience store. The two spoke briefly and left the store. The defendant stood by while the confidential informant purchased drugs from a man standing outside. The court concluded that because there was no evidence as to what the defendant and the confidential informant discussed in the store, there was nothing to support the assertion that the defendant somehow assisted in the sale. *Id.* at ¶ 12. See also *State v. Stephens*, 8th Dist. No. 92430, 2009-Ohio-6305, 2009 WL 4406128 (evidence insufficient to support a conviction for aiding and abetting an attempted murder); *State v. Buelow*, 10th Dist. Nos. 07AP–317 and 07AP–318, 2007-Ohio-5929, 2007 WL 3257247 (insufficient evidence to support a theft conviction where the defendant merely accompanied the thief).

{¶ 92} In the present case, the following testimony was presented as to the charges of complicity to trafficking cocaine and marijuana. First, the victim's sister stated that on March 10, 2008, Gipson told her that he had marijuana in the

trunk of his car. The victim's mother, Queen Amison, testified that she was "somewhat" familiar with the relationship between her son and Gipson. Amison testified that on March 11, 2008, the victim came to her house and retrieved $3,000 that she was holding for him. Amison testified that her son told her that he knew an individual who had some "keys," meaning cocaine.

{¶ 93} The victim's neighbor, Rhonda Farris, testified that she was in the victim's apartment on March 11, 2008. Farris stated that she observed two stacks of bills totaling $20,000. Farris stated that she knew he was going to make a drug transaction that day and that he dealt only with crack cocaine. Farris had not met any of the victim's suppliers.

{¶ 94} Finally, Sandusky Police Sergeant John Orzech testified regarding the street value of cocaine. Orzech testified that for $20,000 an individual could buy anywhere from a half to a full kilo of cocaine (more than 100 grams). Orzech stated that a pound of marijuana (453 grams) would cost about $1,000. According to Orzech, through their investigation police learned that Gipson was bringing a pound of marijuana to Sandusky to sell. Orzech testified that the victim's home was within 1,000 feet of school property.

{¶ 95} Orzech further testified that at the crime scene they recovered a digital scale and Pyrex dish, items that are often used during drug transactions. There was also testimony regarding multiple phone calls between Gipson and the victim leading up to the murder. It is undisputed that no drugs or money were ever recovered.

{¶ 96} Upon review of the evidence presented at trial, we find that it was insufficient to establish the elements of the crimes beyond a reasonable doubt. As set forth above, a defendant's presence at the crime does not, without more, impute the criminal intent of the principal to the defendant. Appellant was placed at the scene, but there was no evidence that he was involved in the alleged drug transaction. Gipson was a known drug dealer. He allegedly had the drugs in his vehicle and spoke with the victim multiple times. There is no evidence that appellant had control over the drugs or participated in setting up the alleged transaction with the victim. In addition to the fact that no drugs were recovered, the amount of the drugs, as charged in the indictment, was purely speculative. Appellant's fifth assignment of error is well taken.

{¶ 97} In appellant's sixth assignment of error, he contends that the trial court erred by failing to merge the gun specifications for aggravated murder and aggravated robbery. In response, the state concedes that the specifications should have been merged. Appellant will be resentenced as to the gun specifications. Appellant's sixth assignment of error is well taken.

{¶ 98} In appellant's seventh and final assignment of error, he argues that he was denied the effective assistance of trial counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must prove two elements: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Proof of prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Further, debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel. *State v. Phillips* (1995), 74 Ohio St.3d 72, 85, 656 N.E.2d 643.

{¶ 99} In this assignment of error, appellant argues that trial counsel was ineffective by failing to raise a Crim.R. 29 motion as to the charges of complicity to trafficking in marijuana and cocaine and when counsel failed to object to the court's failure to merge the gun specifications at sentencing.

{¶ 100} At the close of the state's case-in-chief, appellant's counsel did make a Crim.R. 29 motion for acquittal as to all the counts. Counsel did, however, focus on the aggravated-murder charge and, specifically, the "prior calculation and design" element. We cannot say that counsel's failure to argue the drug charges was constitutionally ineffective. Counsel was aware that the murder conviction would result in a sentence of life imprisonment.

{¶ 101} Reviewing counsel's performance before and during the trial, counsel filed several pretrial motions and participated in multiple oral hearings. Counsel also made numerous objections during the trial and vigorously cross-examined the state's witnesses. Because it was plain error, counsel's failure to object to the error at sentencing did not, ultimately, prejudice appellant who, is serving a life term. Appellant's seventh assignment of error is not well taken.

{¶ 102} On consideration whereof, we find that appellant was prejudiced and prevented from having a fair trial. Appellant's convictions for complicity to trafficking in cocaine and complicity to trafficking in marijuana are vacated. The matter is remanded for resentencing in accordance with this decision. Pursuant to App.R. 24, the state is ordered to pay the costs of this appeal.

Judgment affirmed in part
and reversed in part,
and cause remanded.

SINGER, J., concurs.

YARBROUGH, J., concurs in part and dissents in part.

YARBROUGH, Judge, concurring in part and dissenting in part.

{¶ 103} I concur in the majority's opinion and judgment regarding the disposition of the first, second, fifth, and sixth assigned errors. I respectfully dissent, however, regarding the third assigned error. For the reasons that follow, I would find the third assignment well taken and reverse and remand this case for a new trial on the aggravated-murder and aggravated-robbery charges. That disposition would render the fourth and seventh assignments moot. App.R. 12(A)(1)(c).

{¶ 104} The third assignment raises a critical hearsay issue having two components: first, the correct admissibility analysis for certain out-of-court statements not offered for their truth and, second, if the statements are admitted for a nonhearsay purpose, the proponent's use of those statements during trial. Further, in reviewing the third assignment as a hearsay issue, I find it unnecessary to address appellant's constitutional arguments under *Bruton* and its federal and Ohio progeny. It is sufficient to review the disputed statements here under the standards that the Tenth Appellate District currently applies to the class of extrajudicial statements offered to explain police conduct during a criminal investigation. The *Bruton* issue need not be reached because exclusion follows from a hearsay analysis involving the derivative use of Evid.R. 403(A).

{¶ 105} The core facts are relatively few. The disputed hearsay statements originated from appellant's nontestifying co-defendant, Gipson. In the course of their murder and robbery investigation, the officers had located and questioned Gipson first. From him they learned about a second suspect involved in the crimes, possibly the shooter, who had traveled with Gipson to Sandusky, Ohio, on the day before the murder. This suspect was known only by his sobriquet, "Peanut." It was his identity the officers were attempting to ascertain when Gipson accompanied them by car to Detroit.

{¶ 106} At trial, Officer Steckel testified that as they drove along a particular street, Gipson pointed out a residence where Peanut was believed to be. Over objection, Steckel related that as they passed the residence, Gipson pointed to an individual standing in front and stated, "That's Peanut." Over further objection, Steckel testified that once back at the police station, Gipson confirmed that appellant was Peanut when shown appellant's photograph, stating, "That's him." In responding to these objections, the prosecutor represented that Gipson's out-of-court statements were not being offered for their substantive truth (i.e., to prove that appellant was "Peanut"), but merely to explain the officers' actions in hunting for the second suspect. The trial court overruled the objections, but

instructed the jury that the purpose of the testimony recounting Gipson's statements was "to describe this officer and that department's investigation." The photograph was later used in a photo array from which three other witnesses identified appellant. These witnesses testified at trial while Gipson did not.

### (1) Standard of Review

{¶ 107} The applicable standard for reviewing challenged hearsay is not "abuse of discretion." While there is discretion to admit or exclude relevant evidence, there is no "discretion" to admit hearsay. *State v. Sutorius* (1997), 122 Ohio App.3d 1, 7, 701 N.E.2d 1; *State v. Sorrels* (1991), 71 Ohio App.3d 162, 593 N.E.2d 313. In *Sorrels*, the First Appellate District delineated the correct standard, stating:

{¶ 108} "[T]he trial court's decision to admit hearsay is not governed by the test of abuse of discretion, which the Supreme Court applies to instances where the trial court's evidentiary rulings relate to matters expressly or implicitly within its discretion, as in rulings on relevancy (Evid.R. 402 and 403) or expert testimony (Evid.R. 702). * * * Instead, errors relating to the trial court's admission of hearsay must be reviewed in light of Evid.R. 103(A) and the standard established in Crim.R. 52(A), providing that such errors are harmless unless the record demonstrates that the errors affected a party's substantial right." *Id.* at 165.

{¶ 109} Thus, on appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule (or its exceptions), rather than the more deferential review employed for discretionary rulings. *Id.* In *State v. Kidder* (1987), 32 Ohio St.3d 279, 513 N.E.2d 311, the Ohio Supreme Court established the standard for appellate courts to employ in criminal cases for assessing the effect of improperly admitted hearsay: "In the final analysis, the evidence in favor of conviction, absent the hearsay, must be so overwhelming that the admission of those statements was harmless beyond a reasonable doubt." *Id.* at 284.

### (2) Analysis

{¶ 110} Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is inadmissible under Evid.R. 802, unless a particular statement fails to meet the two-part definition in Evid.R. 801(C), fully satisfies the conditions for nonhearsay prior statements under Evid.R. 801(D)(1) or (2), or falls within one of recognized exceptions under Evid.R. 803 or 804. Under the hearsay rule, Gipson's disputed statements were functionally indistinguishable from those of the paradigm out-of-court declarant.

{¶ 111} Generally, when the facts to be proven at trial and the substantive content of an out-of-court statement coincide, it can be presumed that the proponent is offering the statement for its truth. Facially, therefore, it meets the two-part hearsay definition. If, however, the statement is explicitly offered without reference to its truth, then under Evid.R. 801(C) it is not hearsay. *State v. Lewis* (1970), 22 Ohio St.2d 125, 132–133, 258 N.E.2d 445; *State v. Clay*, 187 Ohio App.3d 633, 2010-Ohio-2720, 933 N.E.2d 296, ¶ 27. The statement's admissibility is then evaluated by the standard of relevancy balanced against unfair prejudice, which is the province of Evid.R. 403(A). See *State v. Maurer* (1984), 15 Ohio St.3d 239, 263, 473 N.E.2d 768. If germane for some valid nonhearsay purpose (e.g., to prove notice, to show the declarant's state of mind, etc.), the statement typically would be admissible for that purpose. See, e.g., *State v. Rice*, 11th Dist. No. 09–A–0034, 2010-Ohio-1638, 2010 WL 1444519, ¶ 22; *State v. Hawthorne*, 6th Dist. L–03–1120, 2005-Ohio-1553, 2005 WL 736994, ¶ 35–37.

{¶ 112} However, admissibility is not automatic in the case of a "dual use" statement. This is an out-of-court statement having an ostensibly nonsubstantive use, but whose content carries substantive import because it relates to an element of the crime or implicates the defendant directly. This problem frequently arises during a police officer's testimony relating what he learned from victims or witnesses while investigating a crime. Despite a professed nonhearsay use, if the statement's content could also cut toward proof of guilt, the risk of prejudicial misuse is great. See *State v. Blanton*, 184 Ohio App.3d 611, 2009-Ohio-5334, 921 N.E.2d 1103, ¶ 38–39, and *State v. Blevins* (1987), 36 Ohio App.3d 147, 149–150, 521 N.E.2d 1105.

{¶ 113} This risk was well described by the Tenth Appellate District. "[W]here statements are offered into evidence to explain an officer's conduct during the course of investigating a crime, such statements are generally not hearsay. * * * There are limits, however, to this general rule because of the great potential for abuse and potential confusion to the trier of fact. * * * *For example, a prosecutor may attempt to use a police officer's testimony regarding his investigative activities as a pretext to introduce highly prejudicial out-of-court statements, while claiming the statements are being offered merely to explain the police officer's conduct, rather than for their truth.*" (Emphasis added.) *State v. Humphrey*, 10th Dist. No. 07AP–837, 2008-Ohio-6302, 2008 WL 5104775, ¶ 11.

(3) *Blevins–Blanton* rules for statements offered "to explain police conduct"

{¶ 114} In *Blevins*, cited by the majority, the Tenth District held that because out-of-court statements purportedly offered to explain police conduct carry the potential for abuse, two requirements must be met before admitting them: first,

"[t]he conduct to be explained should be relevant, equivocal and contemporaneous with the statements. * * * [Second], *such statements must meet the standard of Evid.R. 403(A)."* (Emphasis added.) *Id.,* 36 Ohio App.3d at 149, 521 N.E.2d 1105. For extrajudicial statements of this type, the last requirement—assessment under Evid.R. 403(A)—is critical. The trial court must consider whether the risk that the jury will prejudicially misuse the substantive content for its truth exceeds the probative value of the statement for the nonhearsay purpose. *Blanton* at ¶ 39; *Humphrey* at ¶ 11; *Blevins* at 149–150. In other words, the court must look carefully at the statement's substantive content, find it to be innocuous or, at best, only minimally prejudicial, and conclude that the danger of prejudice does not substantially outweigh the statement's probative value "to explain conduct." Evid.R. 403(A). See *State v. Sinkfield* (Oct. 2, 1998), 2d Dist. No. 16277, 1998 WL 677413. If the court admits the statement after this weighing, an appropriate limiting instruction must be given to the jury. *Blevins* at 150; Evid.R. 105.[1]

{¶ 115} The majority cites *Blevins* for its conclusion that the nonhearsay use of Gipson's statements to explain the investigating officers' actions rendered them admissible. However, in *Blanton,* the Tenth District expanded on *Blevins* by adding a third requirement for statements offered to explain police conduct, holding:

{¶ 116} "Specifically, the conduct to be explained must be relevant, equivocal, and contemporaneous with the statements.* * * Further, the statements must meet the standard of Evid.R. 403(A). *Id. Finally, 'when the* statements connect the accused with the crime charged, they should generally be excluded.'" (Emphasis added.) *Blanton* at ¶ 38–39, quoting *Humphrey,* 2008-Ohio-6302, 2008 WL 5104775, ¶ 11.

{¶ 117} Carefully comparing the nature of the hearsay statements admitted in *Blevins* to those excluded in *Blanton* reveals why the Tenth District adopted a rule of presumptive inadmissibility for statements that "connect the accused with the crime."

{¶ 118} In *Blevins,* 36 Ohio App.3d 147, 521 N.E.2d 1105, the court found that the offered statements met the first requirement: "Detective Kerins related at trial that [the hearsay declarant] Dyer made a phone call." *Id.* at 149. The

---

1. A limiting instruction is particularly critical when the statement's content might imply guilt. It is the court's instruction that operates to contain the statement to its nonhearsay character and function. See Weissenberger, Ohio Evidence Treatise (2010), Section 801.10. See also *State v. Kelly,* 8th Dist. No. 85662, 2006-Ohio-5902, 2006 WL 3233895, ¶ 28–29 (limiting instruction to jury creates presumption it was followed). However, as recognized in *Blanton,* the incriminating content of some out-of-court statements is so inherently prejudicial that no instruction could effectively restrict the jury's use of them to the explanatory purpose.

purpose of the call was to set up a drug buy, with undercover officers posing as the buyers. Thus, "Dyer's statements in this regard aided in giving definite character to Detective Kerins actions." *Id.* As to the second requirement, there was little or no parroting of the *content* of Dyer's statements. Their substantive value was, at best, only minimally prejudicial. This led the Tenth District to conclude that "Dyer's statements neither implicated nor cleared defendant." He "made a phone call" and "[t]he statements merely described * * * how the detectives met the defendant." In other words, the second requirement for admitting Dyer's out-of-court statements—the weighing of relevancy against prejudice under Evid.R. 403(A)—was satisfied. See also *State v. Wilson*, 5th Dist. No. 09–CA–44, 2010-Ohio-1394, 2010 WL 1234447, ¶ 22 (The statement "offered to explain Mr. Moneypenny's reason for not letting appellant into the house was not unfairly prejudicial. The statement was offered merely to explain Mr. Moneypenny's behavior [in keeping him out]").

{¶ 119} In *Blanton*, 184 Ohio App.3d 611, 2009-Ohio-5334, 921 N.E.2d 1103, the defendant, a registered sex offender, was convicted of failing to provide notice to the Franklin County Sheriff's Department that he had changed his address from the motel where he previously resided. At trial, instead of calling the motel's employees to testify from personal knowledge about the time and duration of the defendant's stay at the motel and about the substance of various motel receipts, the prosecutor presented this information through the hearsay testimony of the investigating officers. *Id.* at ¶ 41–42. The *Blanton* court found reversible error in allowing the officers to repeat to the jury the substance of their conversations with motel personnel regarding the defendant's actions and whereabouts. The out-of-court statements carried substantive import that went *beyond* the asserted purpose of "explaining conduct"; instead, the contents carried proof of the elements of the crime: "[They] described the fact that [the defendant] had moved and the specific date upon which [he] moved." *Id.* at ¶ 43. In assessing the remaining evidence, absent the hearsay, the court found that it was not so overwhelming that the error in admitting the statements was harmless beyond a reasonable doubt. *Id.* at ¶ 49.

(4) Applying the *Blevins–Blanton* requirements to the facts sub judice

{¶ 120} When applied here to the police conduct "to be explained," I find that the first requirement of *Blevins* was met. Officer Steckel's initial testimony about his (and the other officers') actions in seeking to identify a second murder suspect with the street name "Peanut," was plainly relevant. *Blevins*, 36 Ohio App.3d at 149, 521 N.E.2d 1105. Without some reference to Gipson's presence to provide context and meaning, their actions in going to a particular residence in Detroit would appear "equivocal," in that it might be unclear to the jury why the officers went there in the first place. There is also no question that Gipson's

statements, when made, were "contemporaneous" with the investigating conduct and vice versa.

{¶ 121} The critical question pertains instead to *Blevins*'s second admissibility proviso requiring an Evid.R. 403(A) assessment: whether repeating the statement's substantive content to the jury was substantially more prejudicial than probative, because in doing so here, that content *connected appellant to the crimes.*[2] *Blanton* at ¶ 39. While hearsay may cease to be an issue when the statement of an out-of-court declarant is not offered for its truth, the issue of relevancy balanced against unfair prejudice remains. *State v. Maurer*, 15 Ohio St.3d at 263, 473 N.E.2d 768.

{¶ 122} Where I believe the majority errs is in its assessment of the substantive content of Gipson's statements when compared with those at issue in *Blevins*.

{¶ 123} In this case, testimony had already established that there were two suspects in the robbery and murder of Calvin Harper Jr., one of whom went by the street name "Peanut." Gipson's out-of-court statements were statements *identifying* the second suspect. Unlike the innocuous hearsay in *Blevins*, Steckel's testimony repeating Gipson's statements went substantially beyond "explaining conduct." Indeed, the statements directly connected appellant to the crimes, essentially telling the jury that he was Gipson's partner in robbery and murder.[3] But for Gipson's identification, there would have been no investigatory link to the second criminal actor. It led to the subsequent photo array from which three witnesses (Farris, Harper, and Poole) further identified appellant.

{¶ 124} In applying the *Blevins–Blanton* rules to this case, the most persuasive precedent on similar facts is *State v. Sinkfield* (Oct. 2, 1998), 2d Dist. No. 16277, 1998 WL 677413, involving a robbery and murder with multiple victims, in which the Second Appellate District reached the same conclusion I do. There, the disputed hearsay statement was also one of identification, but instead of the

---

2. If an officer's investigative steps can be summarized in a way that does not impart to the jury the prejudicial content of the out-of-court statement, then *Blevins'* s second requirement, and the third added in *Blanton*, arguably can be satisfied. It is the *officer's behavior* that is relevant, not the content of the statement. Otherwise, the statement's substance *is* being used for its truth, which renders it inadmissible hearsay. As suggested in *Blevins*, the potential prejudice that arises from repeating the content could be minimized by an officer's foundational testimony that avoids it, e.g., "[during my investigation] I came to know [Mr. Ricks] through my contact with [Mr. Gipson]." See *id.*, 36 Ohio App.3d at 149, 521 N.E.2d 1105, fn. 1. In *Blanton*, the Tenth District found that the extrajudicial statements there "were offered to demonstrate appellant's guilt," because the "repetition of the detailed" contents "undeniably connected [him] with the crime charged." *Id.* at ¶ 43.

3. To some extent, the trial court's limiting instruction here sought to minimize the risk of prejudicial misuse by the jury, although I note the Tenth District in *Blanton* was plainly unconvinced by a similar cautionary instruction.

source being a nontestifying co-defendant, the identification came from an anonymous tip that Dayton police received from a "Crime Stoppers" program. *Id.* As here, the investigating detective used the tip to assemble a photo array from which two victims identified Sinkfield. At trial, as here, the prosecutor defeated a hearsay objection by asserting that the out-of-court statement comprising the tip was not offered for its truth, but "merely to explain why Detective Pearson included Sinkfield's photograph in a photo spread shown to [the victims]." *Id.* In analyzing the substantive content of the statement, the Second District held:

{¶ 125} "[T]he conduct * * * sought to be explained was [Detective Pearson's] act of placing Sinkfield's photograph in the photo spread shown to [victim] J.B. Although Detective Pearson's conduct was relevant and contemporaneous with the out-of-court statement admitted, i.e., that Sinkfield was the other suspect involved in the incident, it is doubtful that Detective Pearson's act of placing Sinkfield's photograph in the photo spread was so equivocal or ambiguous *that it needed to be explained to the jury through the use of the out-of-court statement. Furthermore, the probative value of the out-of-court statement was substantially outweighed by the danger of unfair prejudice, since the statement identified Sinkfield as the other suspect in the incident* [citing *Blevins* ]. * * * Additionally, there was no reason for the prosecutor to have Detective Pearson explain why he placed Sinkfield's photograph in the photo spread shown to J.B. Both J.B. and Byrdsong already had testified that Sinkfield was one of the participants in the robbery and shootings, and J.B. related how he had identified Sinkfield from the photo spread shown to him by Detective Pearson on February 5, 1996. *Thus, it appears that the prosecutor's primary purpose in eliciting Detective Pearson's testimony regarding [the content of] the anonymous tip was for the truth of the matter being asserted therein and not to explain Detective Pearson's actions.* * * * This conclusion is further confirmed by the fact that, *during his closing argument, the prosecutor tried to use the anonymous tip as substantive proof of Sinkfield's guilt.*" (Emphasis added.) *Id.*

{¶ 126} I would therefore find that the trial court erred in permitting Officer Steckel, under the guise of "explaining conduct," to repeat the content of Gipson's statements identifying appellant. The content of those statements, in my view, was substantially more prejudicial than probative (*Blevins*) and despite the limiting instruction, they directly connected appellant to the crimes charged (*Blanton*). Notwithstanding that error, however, the record also reveals a second error that merely compounded the first. It stems from the same prosecutorial conduct cited by the *Sinkfield* court in the last sentence of the above-quoted passage.

##### (5) Misuse of extrajudicial statements admitted for a nonhearsay purpose

{¶ 127} The trial transcript indicates that in closing argument the prosecutor employed Steckel's testimony about Gipson's identification for its *substantive truth*. Permitting this was the second error. See *State v. Kirk*, 6th Dist. No. H–09–006, 2010-Ohio-2006, 2010 WL 1818894, ¶ 28; *State v. Ramos–Aquino*, 10th Dist. No. 09AP–975, 2010-Ohio-2732, 2010 WL 2395776, ¶ 13. Once an out-of-court statement has been admitted for a purpose other than the truth of its content, the content may not be used or relied upon later as *substantive proof* (i.e., for the truth of what it asserts).

{¶ 128} In *State v. Kirk*, we admonished this same switch-of-purpose tactic for otherwise inadmissible hearsay and held it to be prosecutorial misconduct. *Id.* at ¶ 29–33 ("The prosecutor essentially gave the jurors permission to use the hearsay statements as substantive evidence." *Id.* at ¶ 33). We found reversible error where the prosecutor, in closing argument, "referred to testimony which she [had] expressly claim[ed] to have offered not for its truth, but to explain subsequent actions taken by the detectives." *Id.* at ¶ 29. In *Kirk*, an investigating detective had been permitted to testify to several out-of-court statements from a confidential informant. The prosecutor elicited these statements purportedly to explain how the detective's investigation developed. Yet, when their actual use was viewed collectively, the statements "were offered to prove the truth of the matter asserted in them [and demonstrate] appellant's guilt by connecting him to a known drug dealer." *Id.* at ¶ 19–22. Their substantive use during the prosecutor's closing argument went "far beyond" the limited explanatory purpose for which the statements were initially allowed. *Id.* This court held:

{¶ 129} "The prosecutor has now relied on extrajudicial statements for their truth—statements which she maintained during trial were not offered for their truth—as evidence that appellant brought the crack cocaine from Akron into Willard. The prosecutor's remarks were improper and argued beyond the record." *Id.* at ¶ 29.[4]

{¶ 130} In *Sinkfield*, the Second District reached essentially the same conclusion, holding:

{¶ 131} "[W]hile the trial court admitted [Detective Pearson's testimony] for a very limited purpose, the prosecutor either did not understand the limited purpose for which the anonymous tip was being admitted or simply chose to

---

4. We also stated in *Kirk*, 2010-Ohio-2006, 2010 WL 1818894, that "[i]f a statement made by an out-of-court declarant is offered into evidence for a purpose other than asserting the truth of its content, then *the content is not substantive evidence.* * * * A prosecutor must not later assert those statements for their truth during closing argument.*" (Emphasis added.) *Id.* at ¶ 28.

ignore it. Indeed, later on in his closing argument, *the prosecutor brazenly used the anonymous tip for its truth when he told the jury, 'You know everything J.B. told you about identification is substantiated by information received from Crime Stoppers when he [Pearson] got the photo spread together*[.]' * * * [This is] compelling evidence that *the prosecutor's primary motivation in introducing the testimony regarding the anonymous tip was for its truth, and not to explain Detective Pearson's subsequent action.* * * * In light of the foregoing, the trial court abused its discretion by *not excluding as hearsay Detective Pearson's testimony regarding the anonymous tip received from Crime Stoppers, stating that Sinkfield was the other suspect in the incident.*" (Emphasis added.) *Id.*

{¶ 132} Here, the error in admitting Gipson's statements through Officer Steckel's testimony was exacerbated when the prosecutor later improperly referenced them for their truth. The impact of prosecutorial misconduct, however, "must be considered in the light of the whole case" and is not a basis for reversal "unless that conduct deprives the defendant of a fair trial." *Maurer,* 15 Ohio St.3d at 266, 473 N.E.2d 768. As well, the impact of the erroneously admitted hearsay is determined by the *Kidder* standard. *Kidder,* 32 Ohio St.3d at 284, 513 N.E.2d 311. Where both occur, the standards for improperly admitted hearsay and misconduct are combined to evaluate whether the errors were harmless in view of the remaining evidence. See *Kirk,* 2010-Ohio-2006, 2010 WL 1818894, at ¶ 34–35.

{¶ 133} As the majority decision details, three witnesses identified appellant from a photo array. One of them (Farris) specifically identified him as the man who mistakenly came to her door shortly before the murder. Although appellant's first and second assignments challenged as unreliable this identification evidence and the procedures employed to obtain it, I agree they are not well taken for the reasons expressed in the majority decision.

{¶ 134} However, the testimony of these witnesses established only appellant's *presence* in the neighborhood on the day of the crimes, whereas the content of Gipson's statements involved him directly *in* the crimes. The statements were, moreover, facially incriminating, given the source. In using them in closing argument, the prosecutor was not merely summarizing what the investigating officers did, or where they went, or why. He was suggesting that the jury infer guilt from Gipson having identified appellant as "Peanut," thereby using Officer Steckel's testimony about what Gipson said for its truth value, precisely contrary to the basis on which it was admitted.

{¶ 135} In assessing the effect of this testimony, and despite the limiting instruction, I cannot say conclusively that the jury focused *only* on the other witnesses' testimony to support the conviction. Indeed, there is more than a reasonable possibility that the erroneously admitted hearsay—and its misuse—

contributed to appellant's murder and robbery convictions. Therefore, I would find the third assignment of error well taken, reverse the judgment of conviction on those charges, and remand the case for a new trial consistent with this opinion on the hearsay issue.