THE STATE OF OHIO, APPELLEE, *v*. RICKS, APPELLANT.

[Cite as *State v. Ricks,* 136 Ohio St.3d 356, 2013-Ohio-3712.]

*Admission of testimonial, out-of-court statements of alleged accomplice who did not testify at defendant's trial violated defendant's right to confront the witnesses against him under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Ohio Constitution.*

(No. 2011-1912—Submitted January 23, 2013—Decided September 5, 2013.)

APPEAL from the Court of Appeals for Erie County, No. E-10-022, 196 Ohio App.3d 798, 2011-Ohio-5043.

_____

PFEIFER, J.

{¶ 1} In this case, we are asked to determine whether the testimonial, out-of-court statements of an alleged accomplice who is not testifying at a defendant's trial may be admitted through the testimony of an investigating officer for the purpose of explaining the officer's conduct during the course of an investigation. Under the particular facts of this case, we hold that the admission of the alleged accomplice's statements through the testimony of an investigating officer violated the defendant's right to confront the witnesses against him under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Ohio Constitution.

Factual and Procedural Background

{¶ 2} On March 11, 2008, Calvin Harper was robbed and murdered in his residence in Sandusky, Ohio. Harper was a known drug dealer. Aaron Gipson, a Michigan resident, was an associate of Harper's in the drug trade. The state alleged that appellant, Thomas Ricks, traveled with Gipson from Michigan

and participated in Harper's murder. Testimony regarding statements that Gipson made to law enforcement about Ricks is at issue in this appeal.

Murder of Calvin Harper

{¶ 3}   Harper's body was found on March 12, 2008, by Rhonda Farris, who was Harper's neighbor and who sometimes facilitated his drug-trafficking business by allowing Harper to keep his drugs at her house. The police were called; detectives soon learned that immediately before his murder, Harper was to have participated in a drug deal. They checked Harper's phone to determine who might have been involved in that deal and were led to Gipson. Gipson's cell-phone records indicated that he was in Sandusky on both March 10 and 11. The murder occurred at some point after 5:42 p.m. on March 11.

{¶ 4}   Witnesses confirmed that Gipson was in Sandusky on March 10 with another man, who the state alleges was Ricks, and that on that day, they visited with Chanel Harper, the victim's sister, and Chanel's friend Crystal Pool at Chanel's residence; both Chanel and Crystal knew Gipson, but neither had previously seen the man who was with him on March 10. Chanel was able to give detectives a description of the man who was with Gipson; Crystal was unable to give a description but said that she would be able to point him out if she were to see him again. Both later pointed out Ricks in photo arrays as the man who was with Gipson in Sandusky on March 10.

{¶ 5}   Cell-phone records show that Gipson went back to Michigan the evening of March 10 and that he returned to Sandusky late the following afternoon. Those records established that Gipson was in Port Clinton, Ohio, about 20 minutes from Harper's home, when he phoned Harper at 5:15 p.m. on March 11; cell-phone records indicated that at 5:52 p.m. he had begun to leave the Sandusky area and that by 7:06 p.m. he was in Michigan.

{¶ 6}   Farris testified that on the day of the murder, a man had come to her house by mistake and told her he was looking for Harper. Farris called Harper

to warn him of the stranger coming to his home, but according to Farris, Harper reassured her by saying, "[T]hat's my dude, he cool, he cool, good lookin' out." Phone records indicate that there was a call between Farris and Harper at 5:42 p.m. that day. Farris never heard from Harper again. She was able to give the police a description of the man who had come to her door the day of the murder, and she later picked Ricks's photo from a photo array. However, Farris was acquainted with every other person in the photo array.

### Officer Steckel's Testimony

{¶ 7} Sandusky police located Gipson in Canton, Michigan, where he was in police custody for his alleged involvement in another crime. Two Sandusky officers and a detective went to Canton to interview him. The Sandusky police officers did not testify regarding anything that Gipson told them. However, Officer Michael Steckel of the Canton police department testified at the trial regarding statements that Gipson had made to him, and those statements are the focus of this case.

{¶ 8} Throughout the trial, Ricks attempted to have excluded as inadmissible Steckel's testimony regarding Gipson's statements identifying Ricks. Before the trial, Ricks's counsel filed a motion in limine regarding "any acts of allegedly Mr. Gipson pointing out this gentleman, Mr. Ricks, to police officers in Michigan." The court ruled: "[T]he identification procedure, the steps the officers took in their investigation would come in, and I'll give a curative instruction to the jury at that time, if you want." The trial court determined that that process would comply with *State v. Blevins*, 36 Ohio App.3d 147, 149, 521 N.E.2d 1105 (10th Dist.1987), which holds that "where statements are offered to explain an officer's conduct while investigating a crime, such statements are not hearsay."

{¶ 9} Steckel testified that the Sandusky police officers had interviewed Gipson before he had. Steckel subsequently learned from the Sandusky police that two people had been involved in killing Harper: Gipson and another man,

who went by the name "Peanut." There was no testimony during the trial as to how the Sandusky police came up with the name "Peanut"; in a pretrial suppression hearing, a Sandusky police officer testified that Gipson had told the police that Peanut had killed Harper. No other witness testified that anyone named Peanut was in Sandusky either the day of the murder or the evening before.

{¶ 10} Steckel and Sergeant Pomorski of the Canton police department spoke with Gipson, who gave them a general physical description of Peanut. Steckel testified that he, Pomorski, and Gipson traveled by car to Ricks's neighborhood so that Gipson could point out Peanut's house. Gipson identified a house on Strathmoor Street as the place where Peanut was staying. By chance, Peanut was in front of the residence at that time. Steckel testified that Gipson had stated, "That's Peanut." Steckel testified that he had been concerned that Peanut might see Gipson in the vehicle and that Gipson, who was "upset and * * * scared" upon seeing Peanut, had dropped down in the seat so that Peanut could not see him. The officers and Gipson were unable to locate Peanut upon subsequent passes through the neighborhood.

{¶ 11} Steckel testified that he and Pomorski were able to identify "Peanut" as Thomas Ricks by making a telephone call to the address where they had seen him. Steckel was then able to obtain a photograph of Ricks from another jurisdiction. He testified that he had taken that photograph to Gipson in his cell and that Gipson had said, "That's Peanut." Steckel then forwarded the photograph to the police in Sandusky, and they used it in a photo array they presented to witnesses.

{¶ 12} After Steckel's testimony regarding Gipson's statements identifying Ricks as Peanut, to which Ricks had objected, the trial judge gave a limiting instruction to the jury:

4

Ladies and gentlemen of the jury, one of the things that you just heard a few seconds ago from the State was—was hearsay, and there's a concern all the time that statements are made outside of Court and that actual person doesn't come into Court and testify and is not subject to cross examination. There are certain exceptions in the law and that deals with the Evidence Rules that I spoke about yesterday, that we have to comply with those rules.

Sometimes in allowing in information such as that, information that comes in from someone that (inaudible) testify in open Court, there's a purpose for that, and in this case the evidence about Mr. Gipson going with police detectives and, first off, pointing out a residence; second, pointing out the person on the street known as Peanut, and saying that's Peanut, and then later showing the photograph to Mr. Gipson and him saying that's Mr. Ricks, all those are not for the truth of the matter asserted. In other words, they don't necessarily mean that that was Peanut, that man walking down the street, that that was the residence he lived at or that's the photograph, but they're really brought in for the purpose to explain this officer or that department's investigation, why they were doing what they were doing, and the State has laid a foundation, what was your purpose of going out there and those kinds of things. So understand when you're hearing this testimony that it's to describe this officer and that department's investigation in conjunction with the Sandusky Police Department.

### Verdict and Appeal

{¶ 13} The jury found Ricks guilty of one count of aggravated murder, in violation of R.C. 2903.01(A), one count of aggravated murder, in violation of

R.C. 2903.01(B), one count of aggravated robbery, in violation of R.C. 2911.01(A)(1), one count of complicity to trafficking in marijuana in the vicinity of school premises, in violation of R.C. 2925.03(A)(1) and (C)(3)(c) and R.C. 2923.03, and one count of complicity to trafficking in cocaine in the vicinity of school premises, in violation of R.C. 2925.03(A)(1) and (C)(4)(e) and R.C. 2923.03. The trial judge sentenced Ricks to an aggregate term of imprisonment for life without parole, plus 26 years.

{¶ 14} Ricks appealed. The court of appeals vacated Ricks's convictions for complicity to trafficking in cocaine and marijuana, finding insufficient evidence to support them. 196 Ohio App.3d 798, 2011-Ohio-5043, 965 N.E.2d 1018, ¶ 70-96, 102 (6th Dist.). Further, the court agreed with the parties that Ricks's firearm-specification convictions should have merged for the purposes of sentencing, and it therefore ordered the trial court to resentence Ricks as to those specifications. *Id*. at ¶ 97.

{¶ 15} However, the appellate court overruled Ricks's argument that the trial court's admission of Gipson's statements through the testimony of Officer Steckel violated Ricks's rights under the Confrontation Clause. The court noted that the trial court had relied upon *State v. Blevins,* 36 Ohio App.3d 147, 521 N.E.2d 1105, in ruling that Steckel's testimony was admissible. *Ricks* at ¶ 67. The court also cited *State v. Williams*, 10th Dist. Franklin Nos. 02AP-730 and 02AP-731, 2003-Ohio-5204, another case in which the court allowed a police officer to testify regarding the out-of-court statement of a declarant because the statement involved was offered to explain why officers had acted the way they had rather than for the truth of the matter asserted. *Ricks* at ¶ 68. The appellate court in this case concluded:

> In the present case, we have a co-defendant who identified an individual he believed to be Peanut. There is no evidence that

6

Gipson used the opportunity to exonerate himself and implicate appellant. Once Peanut was identified as appellant, the Sandusky officers were able to compile a photo array. Further, the court issued a lengthy curative instruction to ensure that the jury properly interpreted the testimony. Finally, Gipson was made available for questioning but appellant declined. Based on the foregoing, we find that the trial court did not err in allowing the testimony.

*Id.* at ¶ 69.

{¶ 16} The cause is before this court upon the acceptance of a discretionary appeal. 131 Ohio St.3d 1513, 2012-Ohio-1710, 965 N.E.2d 312.

Law and Analysis

Confrontation Clause and Hearsay

{¶ 17} In *Crawford v. Washington,* 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that pursuant to the Confrontation Clause of the Sixth Amendment to the United States Constitution, "[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." There is no dispute in this case that Gipson's statements to police were testimonial—there was no ongoing emergency and the statements were the result of a police interrogation whose "primary purpose [was] to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

{¶ 18} There is also no dispute that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford* at 59, fn. 9, citing *Tennessee v. Street,* 471 U.S.

409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985); *Williams v. Illinois*, ___ U.S. ___, 132 S.Ct. 2221, 2227-2228, 183 L.Ed.Ct 89 (2012) (lead opinion).  Thus, if Officer Steckel's testimony regarding Gipson's statements was not offered to prove the truth of the matter asserted, then it did not violate Ricks's right to confront witnesses.  That is the core issue in this appeal.

{¶ 19} The state argues that the testimony at issue was offered not to prove that Gipson was involved in Harper's murder but instead was offered to show how the Sandusky police had procured a photo of Ricks that they could show to witnesses—the two witnesses, Chanel Harper and Crystal Pool, who testified that they had seen Ricks in Sandusky with Gipson the night before the murder, and another, Rhonda Farris, who testified that she had seen him going to Harper's house around the time of the murder.

### Testimony Regarding Out-of-Court Statements That Is Admitted to Explain Police Conduct Is Not Hearsay

{¶ 20} In *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980), a case involving police-officer witnesses testifying regarding out-of-court statements made by others, this court held that "extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed."  In *Thomas*, the defendants had been convicted of gambling and running a gambling house; the trial court had allowed testimony from law-enforcement officials that they "had received information about a 'sports bookmaking' operation 'taking place in Roseville, Ohio.' "  *Id.* at 232.  This court held that "[t]he testimony at issue was offered to explain the subsequent investigative activities of the witnesses" and was thus not offered to prove the truth of the matter asserted.  *Id.*  The testimony at issue in *Thomas* did not tie the three defendants to the gambling operation—it provided general background to explain what had led the police to begin an investigation into a possible illegal gambling operation in Roseville.

**{¶ 21}** In this case, both the trial court and the court of appeals relied on *Blevins*, 36 Ohio App.3d 147, 521 N.E.2d 1105. In *Blevins*, the court held that "where statements are offered to explain an officer's conduct while investigating a crime, such statements are not hearsay." *Id*. at 149. In *Blevins*, the court related that the witnesses' statements were offered to show how detectives working on a drug-trafficking case had come to know of the defendant. The court concluded: "[The declarant's out-of-court] statements neither implicated nor cleared defendant. The statements merely described the circumstances of how the detectives met defendant." *Id*.

**{¶ 22}** *Blevins* recognized that the admission of out-of-court statements to explain officers' conduct in an investigation carries with it the potential for abuse, and it thus established certain conditions that must be met before admitting such statements: "The conduct to be explained should be relevant, equivocal and contemporaneous with the statements. 6 Wigmore Evidence (Chadbourn Rev.Ed.1976) 267, 268, Section 1772. Additionally, such statements must meet the standard of Evid.R. 403(A)." *Id.*

**{¶ 23}** *Blevins* does not provide an exception to hearsay; it instead exemplifies a situation where testimony is offered for a reason other than for the truth of the matter asserted. The state argues that Steckel's testimony regarding statements made by Gipson is admissible under *Blevins* because the statements explain police conduct; specifically, they explain what led the police to obtain a photograph of Ricks to show to witnesses.

**{¶ 24}** In a case decided after *Blevins*, *State v. Humphrey*, 10th Dist. Franklin No. 07AP-837, 2008-Ohio-6302, the Tenth District Court of Appeals highlighted the limits of allowing testimony regarding out-of-court statements that explain an officer's conduct during the course of investigating a crime. *Humphrey* warns courts against allowing prosecuting attorneys to use police-

officer testimony to introduce unfairly prejudicial out-of-court statements, including testimony that connects the defendant to the crime at issue:

It is well-established that, where statements are offered into evidence to explain an officer's conduct during the course of investigating a crime, such statements are generally not hearsay. *State v. Thomas* (1980), 61 Ohio St.2d 223, 232 [400 N.E.2d 401]. There are limits, however, to this general rule because of the great potential for abuse and potential confusion to the trier of fact. See *State v. Blevins* ([10th Dist.] 1987), 36 Ohio App.3d 147, 149 [521 N.E.2d 1105]. For example, a prosecutor may attempt to use a police officer's testimony regarding his investigative activities as a pretext to introduce highly prejudicial out-of-court statements, while claiming the statements are being offered merely to explain the police officer's conduct, rather than for their truth. Furthermore, when the statements connect the accused with the crime charged, they should generally be excluded.

*Id.* at ¶ 11.

{¶ 25} The court in *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 26 (6th Dist.), described how trial courts should approach assessing prejudice in a *Blevins* analysis:

In short, the well-worn phrase "not offered for the truth of the matter asserted" is not a talismanic incantation that opens the door to everything said outside the courtroom. For an extrajudicial statement of this type, a secondary assessment under Evid.R. 403(A) is required. The trial court must consider whether the risk

that the jury will prejudicially misuse the content for its truth exceeds the probative value of the statement for the nonhearsay purpose. [*State v.*] *Blanton* [184 Ohio App.3d 611, 2009-Ohio-5334, 921 N.E.2d 1103 (10th Dist.)] at ¶ 39; *Humphrey* at ¶ 11; Evid.R. 403(A).

{¶ 26} Although a consideration of possible prejudice is involved in an evaluation under *Blevins*, the ultimate question remains one of hearsay under Evid.R. 801. That is, the analysis of prejudice serves the ultimate question of whether the testimony was offered for the truth of the matter asserted. Thus, if the testimony that is ostensibly offered to explain police conduct is more prejudicial than probative, the jury is more likely to rely on the testimony to prove the matter asserted, which tilts the particular testimony into hearsay.

{¶ 27} In sum, in order for testimony offered to explain police conduct to be admissible as nonhearsay, the conduct to be explained should be relevant, equivocal, and contemporaneous with the statements; the probative value of statements must not be substantially outweighed by the danger of unfair prejudice; and the statements cannot connect the accused with the crime charged.

Evaluation of Steckel's Testimony

{¶ 28} Part of Steckel's testimony did explain what had led him to obtain a photograph of Ricks. Gipson had pointed out the house that Ricks was staying in, and Steckel returned to the police station and telephoned the house to ask for the real name of the person nicknamed Peanut; upon learning the name Thomas Ricks, Steckel then was able to find a record of Ricks and to obtain a photograph of him.

{¶ 29} But key parts of Steckel's testimony were not limited to explaining what had led him to obtain a picture of Ricks. Some of his testimony had nothing to do with police conduct but instead focused on statements from Gipson that

established that Ricks was Peanut, the second person involved in the killing, and that vouched for the evidence that the police had collected. Further, the testimony tied Ricks to Gipson and, thus, to the crime.

{¶ 30} Steckel's testimony regarding Gipson's statements falls into two basic categories for the purposes of our analysis: testimony about the ride to Strathmoor Street and testimony regarding Gipson's statements after Steckel had obtained a photograph of Thomas Ricks.

The Ride

{¶ 31} Steckel testified that while Gipson was in police custody in Canton, Sandusky police officers told Steckel that Gipson had been involved in a murder in Sandusky and that a second man involved in the crime was nicknamed "Peanut." There was no testimony during the trial as to how Sandusky police came up with the name "Peanut"; no other witness testified that anyone named Peanut was in Sandusky either the day of the murder or the evening before. Steckel's testimony created the question "Who is Peanut?" and then provided the answer: "Thomas Ricks."

{¶ 32} Steckel testified that he and a partner drove Gipson to Strathmoor Street so that Gipson could point out the house where Peanut was staying. Gipson, who was riding in the back seat, saw Peanut in front of the place he was staying and identified him. Steckel testified that Gipson had said, "That's Peanut." Steckel testified that he had made eye contact with the person Gipson had identified as Peanut, and the prosecutor asked, "Did you observe the emotional reaction that Gipson displayed after this took place?" Steckel responded, "He was upset and he was scared." He further testified that Gipson had dropped down in his seat.

{¶ 33} Do the statements explain Steckel's investigatory path in this case? The police conduct that Steckel's testimony was meant to explain meets the first three parts of the *Blevins* test. First, the police actions taken in obtaining a picture

of Ricks is relevant. Second, the conduct was equivocal; that is, the conduct required an explanation as to what had led the police to obtain a picture of Ricks. Certainly, without an explanation, it would not be evident to the jury what had led the police to get a picture of Ricks, why the police had gone to Strathmoor Street to try to find Peanut, or how they had determined that the person they encountered on Strathmoor Street was indeed Peanut. Finally, the police's identification of Peanut was contemporaneous with Gipson's statements.

{¶ 34} But even if Gipson's statements were offered to explain police conduct, the *Blevins* test also requires a court to consider whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice and whether the statements tie the defendant to the crime. In this case, we find that the statements were unfairly prejudicial and that the nonhearsay reason given for introducing the statements was a pretext for the real reason: connecting Ricks to the crime. The out-of-court statements were exceptionally damaging in this case because the declarant was the other suspect in Harper's murder and much of the evidence introduced by the state tied that suspect to the crime.

{¶ 35} Again, Steckel testified that he was able to get the name "Thomas Ricks" by calling the residence on Strathmoor Street and asking for Peanut's real name. It was not necessary to admit Gipson's out-of-court statement "That's Peanut" to explain how the police had identified the house where Ricks had been staying. Because of Steckel's testimony that Gipson had identified Peanut, more evidence was offered describing Gipson's mental state upon seeing Ricks: "He was upset and he was scared." This testimony goes beyond answering what had led the police to obtain a picture of Peanut. It establishes that Gipson was afraid of Ricks or was afraid of Ricks's seeing him with police officers. That testimony ties Ricks to Gipson and thus to the crime.

**{¶ 36}** Steckel had already testified that a person nicknamed "Peanut" was Gipson's accomplice in Harper's murder. He then testified that Gipson had identified Peanut by pointing him out in front of the house at which he was staying. The fact that Gipson was the person who made the out-of-court statements identifying Ricks as Peanut is especially prejudicial in this case because most of the state's evidence in the case revolves around Gipson. This court has established that an alleged accomplice's out-of-court statement incriminating a defendant is "particularly deserving of cross-examination." *State v. Issa*, 93 Ohio St.3d 49, 60, 752 N.E.2d 904 (2001).

**{¶ 37}** Gipson was not only Ricks's alleged accomplice—the state's case revolved around him. The state presented evidence indicating that Gipson was the person who had set up the drug deal with Harper on the day of the murder. And the state presented Gipson's cell-phone records, which tracked his movements around the time of the murder and established that he was in Sandusky calling Harper around the time of the murder. Gipson's establishing a presence at a Detroit-area casino on the night of the murder was used as evidence that he was trying to create an alibi for himself. Thus, the state's evidence established that Gipson was involved in Harper's murder. The state then relied on Officer Steckel's testimony to relay Gipson's out-of-court statements implicating Ricks, thereby allowing the jury to hear Gipson's statements without Gipson's having to undergo cross-examination.

**{¶ 38}** The court of appeals stated in its decision that "Gipson was made available for questioning but appellant declined." 196 Ohio App.3d 798, 2011-Ohio-5043, 965 N.E.2d 1018, ¶ 69. But Gipson never testified for the prosecution. It was not the defendant's job to bring him to the stand: "[T]he Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court."

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324-325, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).

{¶ 39} Gipson's out-of-court statements connected Ricks to Gipson and to the crime. The state amplified the danger of unfair prejudice by eliciting further testimony from Steckel that Gipson was upset and scared upon seeing Ricks. That testimony encouraged the jury to misuse the content of the out-of-court statement for its truth. That is, the jury would interpret Gipson's statement "That's Peanut" as a statement identifying who had been his accomplice in the murder rather than as evidence to explain why the police had obtained a photograph of Ricks to show to other witnesses.

The Ricks Photograph

{¶ 40} Steckel testified that after the ride to Strathmoor Street, he returned to the police station and was able to determine that the person known as Peanut was Thomas Ricks. He was then able to obtain a photograph of Ricks from another jurisdiction. He later sent that photograph to the police in Sandusky, who showed it to Chanel and Crystal—the women who had been with Gipson and his associate the night before the murder—and Harper's neighbor, Farris, who saw a man go to Harper's house just before the murder. But after Steckel described for the jury how the Sandusky police had obtained the picture of Thomas Ricks, the state asked Steckel whether Gipson had identified the person in the photograph as Peanut:

> Q. Once again, Officer Steckel, when you showed Aaron Gipson this photo, after obtaining it from Georgia, did he make identification?
> A. Yes.
> Q. What did he say?
> A. He says that's Peanut.

{¶ 41} Steckel's testimony went well beyond describing how the Sandusky police had obtained a photograph of Thomas Ricks. The statement "That's Peanut" goes to the truth of the matter asserted—that the person in the photograph, Thomas Ricks, is "Peanut," the person Steckel had previously established as Gipson's accomplice. Steckel did not need to testify about Gipson's statements regarding the photograph of Thomas Ricks to explain how the police had come up with a photograph of Thomas Ricks—the procurement of the photograph was complete before Steckel showed it to Gipson. Gipson's statement regarding the photograph—"That's Peanut"—served as confirmation that Ricks was Peanut. The state used Gipson's out-of-court statement as evidence to prove that the person in the photo had committed the crime. Thus, Gipson's statement did not explain what had led the police to obtain the photograph; it gave value to the photograph as a piece of evidence. It gave an accomplice's seal of approval on the evidence and identified Thomas Ricks as Gipson's accomplice.

{¶ 42} There was no further police conduct to be explained to the jury through Gipson's statements once Steckel explained what had led the Canton, Michigan, police to obtain a picture of Ricks. An evaluation under *Blevins* is not necessary when the testimony was not admitted to explain police conduct. Gipson's statement regarding the Ricks photograph—"That's Peanut"—was offered for the truth of the matter asserted, that the person in the photograph was indeed the person known as Peanut, who had previously been identified as Gipson's accomplice.

### Closing Argument

{¶ 43} The state returned to Steckel's testimony about Gipson's statements in closing argument. Those statements were used not to explain how

16

the police went about their investigation, but rather for the truth of the matters asserted.

> [Steckel] testified that Aaron Gipson pointed out a subject by the name of Peanut, later identified as the defendant, Thomas J. Ricks, and he said that that was in front of the home—and he gave an address, and you have that address, but, more importantly, it was the home and residence of a Deotis Sears. Now, later on we find out that Deotis Sears is the uncle of Thomas J. Ricks.

> Now, he also indicated that there was eye contact made with this subject known as Peanut. He indicated that Aaron Gipson was visibly shaken and upset with (inaudible). He said, he also testified that he actually sank down in the back of the seat. He indicated that they then drove around the block because they were afraid that Thomas J. Ricks, or the person then they understood was Peanut, may have spotted them.

> * * *

> He then obtained a photograph of Mr. Ricks from Georgia, had it forwarded—had it up to his department. At that point in time he took that photograph, which is * * * State's Exhibit 54, I believe, and actually showed it to Aaron Gipson and Aaron Gipson said that's him.

{¶ 44} The closing argument demonstrates that Gipson's statements were offered not to explain police investigatory conduct, but to tie Ricks to Gipson as an accomplice in the murder. Steckel's testimony was characterized as evidence against Ricks rather than as an explanation of how the police investigation resulted in obtaining a photograph of Ricks.

Constitutional Error

**{¶ 45}** We conclude that both instances in Officer Steckel's testimony when he related that Gipson had stated, "That's Peanut," constituted hearsay because they were offered to prove the truth of the matter asserted rather than to explain police conduct. Since the statements were testimonial, the admission of the statements violated Ricks's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

**{¶ 46}** Although the court committed constitutional error, such error can be harmless in certain circumstances:

> A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705. Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. Id. at 23, 87 S.Ct. 824, 17 L.Ed.2d 705; *State v. Madrigal* (2000), 87 Ohio St.3d 378, 388, 721 N.E.2d 52.

*State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78.

**{¶ 47}** In this case, we determine that there is a reasonable possibility that Steckel's testimony that Gipson pointed out Ricks as "Peanut" contributed to Ricks's conviction. There was certainly other evidence offered against Ricks— the identification of Ricks by Farris as the man who mistakenly came to her door looking for Harper near the time of the murder, records of cell-phone calls from

18

Gipson to the house on Strathmoor Street where Ricks was staying, Ricks's statement that he did not know Gipson, Ricks's damaging but not quite confessional recorded jailhouse phone calls to his girlfriend, Ricks's representation that he had been in Atlanta since February 19, 2008, when a March 27, 2008 bus ticket from New Orleans to Atlanta in the name of his known alias belied that claim—and a jury might have convicted Ricks on that other evidence alone. But the fact that much of the proof in the case was against Gipson makes it reasonably possible that the testimony regarding the statements he made in identifying Ricks would have carried weight with the jury.

{¶ 48} Accordingly, we reverse the judgment of the court of appeals and remand the cause to the trial court for a new trial.

Judgment reversed

and cause remanded.

O'DONNELL, KENNEDY, and O'NEILL, JJ., concur.

O'CONNOR, C.J., and LANZINGER and FRENCH, JJ., concur in judgment only and concur separately.

_____

**FRENCH, J., concurring in judgment only.**

{¶ 49} I agree that Gipson's out-of-court statements were inadmissible, but I do so based solely on Evid.R. 403. While the majority focuses on whether Gipson's testimonial statements constituted hearsay, triggering the Confrontation Clause, it is important to note that the trial court explicitly instructed the jury that Gipson's out-of-court statements identifying Ricks as "Peanut" were "not [offered] for the truth of the matter asserted" and could be considered for only the nonhearsay purpose of "explain[ing] this officer or that department's investigation." Generally, this type of instruction ensures that the jury will consider evidence of limited admissibility for its admissible purpose rather than its inadmissible purpose. *See* Evid.R. 105. We must presume that juries follow

limiting instructions, and this presumption "fully applies when rights guaranteed by the Confrontation Clause are at issue." *Tennessee v. Street*, 471 U.S. 409, 415, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), fn. 6.

{¶ 50} The fact that a limiting instruction can be given regarding certain relevant evidence, however, does not guarantee its admissibility. When the danger of unfair prejudice substantially outweighs the probative value of the evidence, it is not admissible. Evid.R. 403; *see also* 1980 Staff Note, Evid.R. 105 (noting the "very close relationship" between Evid.R. 105 and Evid.R. 403 and recognizing the possibility that a limiting instruction may be inadequate to reduce the danger of unfair prejudice). The risk of prejudice is "grave" in cases such as this one, where a statement is admitted for a nonhearsay purpose, but on its face, the statement "asserts facts directly relevant to a critical issue in the case and the declarant would presumably have personal knowledge of the facts." 1 McCormick, *Evidence*, Section 59, at 409 (7th Ed.2013).

{¶ 51} In this case, the trial court's limiting instruction did little to ameliorate the risk that the jury would misuse Gipson's out-of-court statements as substantive evidence of guilt. While the statements undeniably satisfied a nonhearsay purpose—explaining the course of the police investigation, *see State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980)—they also constituted direct evidence of identity, supplied by an accomplice with personal knowledge. It is usually possible to explain the course of an investigation without relating historical aspects of the case, and in most cases, testimony that the officer acted "upon information received," or words to that effect, will suffice. 2 McCormick, *Evidence*, Section 249, at 193-195 (7th Ed.2013).

{¶ 52} That was true here, where it would have been possible to explain how the investigation led to Ricks without introducing Gipson's exact statements or his behavior upon seeing Ricks. Nor was it necessary to inform the jury that it was Gipson—the alleged accomplice—who led police to Ricks. That information

had little probative value and a high likelihood that the jury would misuse it as substantive evidence of Ricks's guilt, even with the trial court's limiting instruction.

**{¶ 53}** Finally, there is no need to consider whether the prosecuting attorney used the nonhearsay aspect of the statements as a pretext for introducing inadmissible hearsay. Whenever a statement qualifies as both nonhearsay and hearsay, standards of relevancy and prejudice should govern admissibility. *State v. Maurer*, 15 Ohio St.3d 239, 263, 473 N.E.2d 768 (1984). Because the probative value of Gipson's statements was substantially outweighed by the risk of unfair prejudice, I believe that the statements were inadmissible under Evid.R. 403.

O'CONNOR, C.J., and LANZINGER, J., concur in the foregoing opinion.

_____

Kevin J. Baxter, Erie County Prosecuting Attorney, and Mary Ann Barylski, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Kristopher A. Haines, Assistant Public Defender, for appellant.

_____