[Cite as *State v. Jamond Terry*, 2024-Ohio-2876.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230383 |
| | | TRIAL NO. B-1907101 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| JAMOND TERRY, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 31, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Keith Sauter*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher* and *Elizabeth Conkin*, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1}   After a jury trial, defendant-appellant Jamond Terry was convicted of four counts of aggravated robbery—with firearm specifications—in violation of R.C. 2911.01(A)(1), one count of robbery in violation of R.C. 2911.02(A)(2), one count of aggravated burglary—with a firearm specification—in violation of R.C. 2911.11(A)(2), and one count of having a weapon under disability in violation of R.C. 2923.13(A)(2).[1] The trial court sentenced Terry to a total aggregate sentence of 13 to 16 years, six months, with credit for 1332 days of time served.  Terry now appeals.

{¶2}   In his first assignment of error, Terry challenges the admission of testimony regarding a statement from a DoorDash representative who did not testify at trial, arguing that the admission of the testimony violated his right to confront witnesses against him under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.  In his second assignment of error, Terry challenges the admission of a police officer's testimony that he was close friends with an individual named Ravon Raglin, arguing that the testimony was admitted in violation of Evid.R. 403 and was prejudicial to him.  In his third and fourth assignments of error, Terry challenges his convictions as being against the manifest weight of the evidence and based on insufficient evidence.  For the reasons that follow, we overrule the assignments of error and affirm the judgment of the trial court.

## II. Evidence Presented at Trial

### A. The Incident on Warner Street on October 13, 2019

{¶3}   Testimony established that, in the very early morning hours on October 13, 2019, a group of friends were gathered at the residence located at 170 Warner

---

[1] The parties stipulated for the purpose of trial that Terry was under a disability.

Street. Some were gathered in the backyard, and some were inside the house. Trae, who was upstairs in the house, heard a knock on the door and opened his back window to tell the others that someone was at the door. Assuming it was the pizza they ordered, Matthew and Bryan walked to the front door. Trae started making his way downstairs.

{¶4} Bryan testified that, as they were walking to the door, he saw a younger male through the window leaning against the railing who made a motion or signal like a telephone as they approached the door ("the second man"). When they opened the door, a gun was pointed through the doorway and another individual—who they identified as Terry—walked inside, demanding "money and weed." Trae, who was on the stairs, said that Terry came through the door with the gun and started backing people into the room. Bryan testified that he told Terry he had the wrong house and that Matthew "[took] off" to the kitchen after the men pushed into the house. Both men followed Matthew into the kitchen and left him and Trae alone for around ten seconds.

{¶5} Matthew testified that he started backing up when Terry came in the house, but Terry told him he would shoot him if he took another step. In the area he was backed into, he gave Terry his wallet in response to Terry's commands. Then, once Terry turned back toward Trae and Bryan, Matthew went into the kitchen, where he was "patted down" by the second man, who took his phone out of his pocket. He said the second man also took his friend Zach's phone. He was then left alone in the kitchen, so he stepped outside to tell his friends out back to call the police, but they were already calling. When he came back inside, he heard Emily, who had just come out of the bathroom, yelling and screaming. He said the second man then grabbed Emily and forcibly threw her to the couch. He testified that it seemed like Terry was holding the gun on them at this point to make sure they didn't help Emily.

{¶6}  Zachary testified that he was in the kitchen with Matthew when Terry walked in with a gun and started pulling Matthew's phone and wallet out of his pockets.  Recognizing that he was being robbed, he took his wallet out of his pocket, and then Terry put the gun to his head and reached into his pocket and took his phone and his wallet out of his hand.  Terry and Matthew then left the room, and he walked into the other room where he saw the second man hovering over his girlfriend, Emily.  He said, "I went to him to get him off, and they left shortly after that."  He denied remembering the second man coming into the kitchen.

{¶7}  Emily testified that she came out of the bathroom and the second man came up to her asking for her "things."  Once she didn't give him anything, he put his hand on her neck and started to push her toward the couch.  She was trying to avoid eye contact because she was scared.  She said the interaction ended when Zach came in from the kitchen and told the man to get off of her.  She did not know that there was someone else in the house at the time.

{¶8}  Bryan testified that when Terry came back into the front room with him and Trae after following Matthew, Terry waived the gun between him and Trae, again demanding money and weed, and then started counting.  Trae testified that Terry put the gun to his temple and told him he had three seconds to tell him where all the money and weed was, and then began counting down.  Bryan said that he told Terry they did not have "any of that" and Terry just stopped talking with the gun still aimed at Trae and was "checking and making sure of what was going on."  Trae said that he thought he was going to get shot in the face, but Bryan told Terry to take whatever he wanted and leave them alone, which he felt saved his life.  He denied remembering what Terry did after that.  He recalled hearing a female scream at one point.  He said the second man was not in the room at this point.  Bryan testified that the second man was going

around trying to steal items and "getting into it with Emily," and then came back into the room and demanded his wallet. He told the second man he didn't have his wallet, and Terry said, "Let's just go." The experience ended when both men suddenly ran out of the house.

{¶9} Kelsey testified that she was in the backyard when she realized the robbery was occurring. She said someone ran outside and told them to run. She ran to the side of the house, looked inside for a "split second," and saw a man pointing a gun through the window.

{¶10} Officer Neal testified that he responded to the incident on Warner Street at around 3:30 a.m. He did not see anything when he arrived and went up to the house and "was met with a bunch of college kids." He said:

> What they had told me is that when I get – when they were at the house, there was a knock at the door. I guess at some point they had ordered pizza and they were expecting pizza, but when they answered the door, it was not the pizza delivery guy.

> Two or three students go to the front door, all happy their food is here, and they open the door, and there is a male black standing at the door. And then right as they open the door and they see him, another male black off to the side turns the corner with a gun and they kind of bum-rush into the house.

> * * *

> So then they – the one with the gun orders everybody to the ground, and then – or sitting down while the other one starts gathering property, going around kid to kid taking property out of the front room.

The one gathering property, at some point, makes his way all the way back to the kitchen area.

* * *

I guess there is [sic] purses in the kitchen and takes property from in the kitchen on the table. And then, in the meantime, the one with the gun is kind of the center of it all, and there is a girl that comes out of the bathroom, unbeknownst that any of this is going on, and she comes out, she's grabbed by the hair and thrown to the floor.

{¶11} He tracked the cellphones using "one of the kid's Track my iPhone." Both cellphones were recovered on the sidewalk around the corner and up the street within 20 minutes of when he arrived. No suspects were around the phones.

### B. Identifying Evidence

{¶12} Sergeant White testified that he responded to a call on October 15, 2019, (two days after the incident on Warner Street) and found a firearm at 624 Probasco Street ("the Probasco gun"). Detective Jones testified that she talked to Terry about the Probasco gun and Terry said the gun was his. Criminalist Horning testified that fingerprints lifted from the Probasco gun were identified as Terry's. Matthew, Trae, Bryan, Zachary, and Kelsey identified the Probasco gun as the gun used during the incident on Warner Street ("the robbery"). However, Bryan acknowledged that he could not "say 100 percent." He said, "But that's what it looked like."

{¶13} Criminalist Horning also testified that fingerprints lifted from the stolen cellphones were identified as Ravon Raglin's. Officer Manning testified that he worked as a school resource officer where Terry went to high school, and said that Terry was friends with Raglin, in and out of school, and Raglin lived with Terry for a short period of time.

{¶14}  Matthew testified that his credit card was in the wallet he gave Terry. He looked at his credit card statement, and there were "several" additional charges that he did not make.  One of the charges was a charge from DoorDash for an attempted food order.  He contacted DoorDash and received "information" from them. He reported the information to the police and used the name he received to search Facebook two days after the robbery.  When he searched Facebook, he found photographs from Terry's Facebook page.  He testified that he "immediately" recognized Terry in the photographs from "the night that he robbed [him]."  He sent some Facebook photographs to the people that were in the house with him during the robbery.  He said they had an ongoing group chat discussing the robbery.  When asked on cross-examination if, when he sent the photos to the others, he told the others that he thought this was the person who conducted the robbery, he responded, "I believe I told them that DoorDash gave me Jamond Terry's name and said that this is the person that used my card.  And from there I searched his name on Facebook and identified him right away from the robbery."

{¶15}  Matthew, Trae, and Bryan later identified Terry in a police lineup. Zachary also identified Terry in a line up but was only 60 percent sure.  When Matthew was asked if he picked Terry out of the lineup because he remembered Terry from the robbery or because he remembered Terry from the Facebook photos, Matthew testified that he remembered him from the robbery, "100 percent."  However, he admitted that he had "repeatedly" seen Terry's face in the Facebook photographs prior to the lineup.  When asked how he knew he identified Terry from the robbery rather than the Facebook photographs, he said, "It's hard to explain it.  I would say it's more of like a physical reaction like after experiencing trauma.  That when you're reminded

7

of that trauma, it's something that you know right away." He said he had a "physical reaction" to the photos.

{¶16} Trae testified that he saw the Facebook photographs and recognized the person in the photographs "from having a gun to [his] face, to threatening [him,] to counting down." When asked what his reaction was when he saw the photos, he said:

> So when I initially saw these photos, I couldn't believe it. I was fully disgusted. I felt as if my –I forgot, or—it felt like I just didn't know how to react to it, that I felt like I was pushed in the back of my chair. I felt like I couldn't catch my breath. Like, it – I just felt like something was taking over my body, and I don't know how to explain it other than it really just felt like my skin was just crawling out from underneath itself.

He could not remember whether he saw the Facebook photos before he identified Terry in the lineup.

{¶17} Bryan agreed that he saw a Facebook photograph of Terry and said he believed he saw the photo prior to the lineup. He testified that, when he saw the photo, he "knew it was him," and recognized Terry "immediately" from the robbery. When asked on cross-examination if, when he did the lineup, he was looking for the image from the Facebook photo, he agreed that he was but also said that he was keeping an open mind in the event that he was wrong. When asked on redirect examination whether, when he picked Terry out in the lineup, he remembered Terry from the Facebook photo or from the robbery, he replied, "I remember him from the robbery." When asked if he was trying to pick out the person in the photo or the person that was in the house with the gun, he replied that he was "trying to pick out the one that [he] remembered having the gun, because the image that is burned in [his] head was the

8

one of [Terry] counting down, holding the gun to Trae's head." He said, "So I remember exactly what his face looked like when he was looking at me and he was counting down from 10, and I knew—I knew that was Jamond. I knew it."

{¶18} Zachary also agreed that he saw at least one of the Facebook photographs and believed that he saw the photograph prior to the lineup, although he could not say for sure. Emily testified that she saw the Facebook photographs but was unable to pick anyone out from the lineup. Kelsey was also unable to pick anyone out from the lineup.

{¶19} Matthew, Trae, Bryan, and Zachary identified Terry in court as the individual with the gun.

### III. Law and Analysis

### A. Admission of the DoorDash Statement

{¶20} In his first assignment of error, Terry challenges the admission of Matthew's testimony regarding the information he received from DoorDash. Terry argues that, although the trial court sustained the objection as to what DoorDash actually told Matthew in the email, the context in which the DoorDash information was provided nevertheless made it clear that DoorDash identified him as the person involved in using the stolen credit card and thus was inadmissible hearsay admitted in violation of his right to confront witnesses against him.

{¶21} " 'While admission of testimony is generally reviewed for an abuse of discretion, the question of whether a criminal defendant's rights under the Confrontation Clause have been violated is reviewed de novo.' " *State v. Sanon*, 2023-Ohio-2742, 223 N.E.3d 91, ¶ 67 (1st Dist.), quoting *State v. Banks*, 1st Dist. Hamilton Nos. C-200395 and C-200396, 2021-Ohio-4330, ¶ 14.

**{¶22}** "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right. . . to be confronted with the witnesses against him.' " *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Confrontation Clause applies to "witnesses," i.e., those who "bear testimony." *Id.* at 51. " 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id.* "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a causal remark to an acquaintance does not." *Id.* "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

**{¶23}** "A statement is testimonial if it is made with a ' "primary purpose of creating an out-of-court substitute for trial testimony." ' " *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 181, quoting *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 87.

**{¶24}** "[W]hether a statement to a person who is not a law-enforcement officer is testimonial depends on the expectations of the declarant: would the declarant have reasonably believed that the statement would be available for later use at trial?" *Id.* at ¶ 182, citing *State v. Jones*, 153 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 161.

**{¶25}** The first issue we must address is whether Matthew's testimony about the information he received from DoorDash established a testimonial statement from DoorDash. Matthew testified as follows:

Q: And did you inquire into any of those charges?

A: Yes, I did.

Q:     What charge did you inquire?

A:     There was one charge from DoorDash, which was an attempted food order, and my card had shut off—they had—my bank had shut off my card because there were large purchases attempted at around 3:00 to 4:00 in the morning, which they had flagged and shut off my card, which is why they blocked this transaction with Doordash.

Q:     Okay.  Did you contact DoorDash?

A:     Yes.

Q:     Did you get any information from DoorDash?

A:     Yes, I did.

Q:     What did you do with the information you got from DoorDash?

A:     Well, I got an email from DoorDash saying that the account –

DC:    Objection.

C:     So I'm going to sustain that objection.

Q:     Without saying what DoorDash told you, you got information from DoorDash; correct?

A:     Yeah.

Q:     Okay.  What did you do with that information –

A:     I reported—

Q:     —without telling me what the information was.

A:     I reported it to the police.

Q:     Did you do any of your own investigation?

A:     Yes.

Q:     What did you do?

A:      Well, the name that was given to me, I had searched on Facebook.

**{¶26}** When viewed in context, Matthew's testimony established that DoorDash sent him an email saying that Terry's account was the account that used his credit card. However, the testimony does not establish the context in which this email was sent or any other details surrounding the interaction. Thus, there is no information in the record that would allow this court to ascertain the context in which the DoorDash statement was provided in order to determine whether DoorDash would have reasonably believed the statements in the email would be available for later use at trial. Consequently, we hold that the record is insufficient to establish that the DoorDash statement was even testimonial.

**{¶27}** Nevertheless, assuming that the statement was testimonial, we further hold that the statement was offered for a permissible nonhearsay purpose.

**{¶28}** The Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. *Crawford*, 541 U.S. at 59, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 9, citing *Tennessee v. Street*, 471 U.S. 409, 414, 405 S.Ct. 2078, 85 L.Ed.2d 425 (1985); *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 18. The state asserts that the statement was not offered for the truth of what DoorDash told Matthew, but rather to explain Matthew's use of Terry's name in his search on Facebook.

**{¶29}** Terry argues that, under *Ricks*, the testimony was so prejudicial that it could not be offered for a nonhearsay purpose since the testimony connected Terry to the crime. However, even assuming *Ricks* would be applicable to the instant case, we hold that this case does not present the same situation that was presented in *Ricks*.

{¶30} In *Ricks*, an officer testified that an alleged accomplice, Gipson, identified the defendant in person during his investigation as the other person involved in the murder for which the defendant was charged. *Ricks* at ¶ 9-10. In doing so, the officer testified to a number of other details of his investigation with Gipson and the information obtained from him, such as that Gipson was upset and scared upon seeing the defendant. *Id.* at ¶ 9-11. The officer's testimony was purportedly offered to explain how the officer obtained the defendant's photograph to show other witnesses who subsequently identified the defendant. *Id.* at ¶ 19. However, the Ohio Supreme Court held that the officer's testimony was not admissible for this purpose where the reason given was simply a pretext for the real reason, which was connecting the defendant to the crime charged. *Id.* at ¶ 34. The court explained that only part of the testimony actually explained what led the officer to obtain the photograph of the defendant, while the other parts had nothing to do with police conduct and instead went directly to establishing that the defendant was the other individual involved in the murder. *Id.* at ¶ 28-29. Further, the court said that the danger of unfair prejudice was amplified by the additional testimony that Gipson was upset and scared upon seeing the defendant. *Id.* at ¶ 39. The court said, "That testimony encouraged the jury to misuse the content of the out-of-court statement for its truth. That is, the jury would interpret Gipson's statement 'That's Peanut' as a statement identifying who had been the accomplice in the murder rather than as evidence to explain why the police had obtained the photograph of [the defendant] to show other witnesses." *Id.*

{¶31} Here, unlike *Ricks*, there is no indication that the testimony about the DoorDash email was more likely to be used to establish that Terry was the individual who conducted the robbery rather than to explain Matthew's conduct during his investigation that led to the ultimate identifications. Matthew's testimony established,

at most, that someone using Terry's DoorDash account attempted to use the stolen credit card. This does not directly connect Terry to the crimes charged in a way sufficient for a conviction. Rather, the pertinent evidence that actually linked Terry to the crimes charged was the subsequent identifications of Terry by the victims based on both his Facebook photograph and the police lineup. Consequently, we distinguish this case from the situation presented in *Ricks* and hold that it was permissible to offer Matthew's testimony about receiving the information from DoorDash for the nonhearsay purpose of explaining his use of Terry's name in his search on Facebook.

{¶32} Terry also challenges the admission of Matthew's testimony pertaining to DoorDash during cross-examination, arguing that this testimony was admitted in violation of the trial court's previous ruling that he could not say directly what DoorDash told him. Matthew testified as follows:

Q:      But everyone else you sent photos to –

A:      Yeah.

Q:      -- and identified – did you identify to those other individuals in the group chat this is the person that you thought did it?

A:      I believe that I told them that DoorDash gave me Jamond Terry's name and said that this is the person that used my card. And from there I searched his name on Facebook and identified him right away from the robbery.

Q:      That's not what I'm asking you. Did you identify to the other individuals in the group chat, "This is the person that did it"?

A:      I think it was probably just the picture. I don't remember exactly what I said.

**{¶33}** While this testimony does directly establish what DoorDash told Matthew, Terry failed to object and/or move to strike the testimony at trial and has therefore forfeited all but plain error. *See, e.g., City of Cleveland v. Neal*, 8th Dist. Cuyahoga No. 11260, 2024-Ohio-1467, ¶ 35, citing *State v. Houston*, 8th Dist. Cuyahoga Nos. 106470 and 106055, 2018-Ohio-3043, ¶ 25 (recognizing that, although Confrontation Clause issues are typically reviewed de novo, the failure to object results in a defendant waiving all but plain error). And, for the same reasons already outlined above, we hold that the trial court did not commit error, let alone plain error, in the admission of this testimony.

**{¶34}** Consequently, for all the foregoing reasons, we overrule the first assignment of error.

### B. Admission of Officer Manning's Testimony

**{¶35}** In his second assignment of error, Terry challenges the trial court's admission of Officer Manning's testimony connecting him to Raglin under Evid.R. 403. He argues that this testimony was more prejudicial than probative as it did nothing more than establish guilt by association.

**{¶36}** The record does not reveal that Terry objected to the admission of this testimony on Evid.R. 403(A) grounds. Consequently, he has forfeited all but plain error. *See, e.g., State v. Wendel*, 3d Dist. Union No. 14-16-08, 2016-Ohio-7915, ¶ 14, citing *State v. Johnson*, 10th Dist. Franklin No. 05AP-12, 2006-Ohio-209, ¶ 17 ("Because [defendant]'s trial counsel did not object to [the] testimony on Evid.R. 403(A) grounds, [defendant] waived any error based on Evid.R. 403(A) absent plain error."). " 'Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise.' " *Johnson* at ¶ 17.

**{¶37}** Evid.R. 403(A) provides, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." " ' "Evid.R. 403 speaks in terms of unfair prejudice. Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant. It is only the latter that Evid.R. 403 prohibits." ' " *Ohio v. Craig*, 1st Dist. Hamilton No. C-160816, 2020-Ohio-3103, ¶ 20, quoting *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 107.

**{¶38}** "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *State v. Love*, 10th Dist. Franklin No. 19AP-666, 2021-Ohio-4451, ¶ 18, citing *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001).

**{¶39}** While officer Manning's testimony may have been prejudicial to Terry, Terry fails to point to any authority to show that Officer Manning's testimony was *unfairly* prejudicial, and we do not see this testimony as the quality of evidence that may have resulted in an improper basis for the jury decision in this case. Consequently, we fail to find plain error in the admission of this testimony. Accordingly, we overrule the second assignment of error.

### C. Sufficiency and Manifest Weight of the Evidence

**{¶40}** In his third and fourth assignments of error, Terry argues that his convictions were based on insufficient evidence and against the manifest weight of the evidence where the convictions were based on unreliable and inadmissible evidence as the improper admission of the DoorDash information made the identification testimony more credible, and the testimony of Matthew, Trae, and Bryan was inconsistent with Officer Neal's testimony about what was said upon his arrival to the scene.

**{¶41}** "In reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime had been proven beyond a reasonable doubt." *State v. Brantley*, 1st Dist. Hamilton No. C-210258, 2022-Ohio-597, ¶ 14, citing *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶42}** "When considering a challenge to the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice." *Brantley* at ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most ' "exceptional case in which the evidence weighs heavily against the conviction." ' " *Id*., quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

**{¶43}** In essence, Terry argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence where there was no reliable evidence identifying him as the individual that committed the crime.

**{¶44}** Matthew, Trae, Bryan, and Zachary all testified that they identified Terry based on their recollection of him from the robbery, and identified Terry in court as the one who robbed them. They, as well as Kelsey, also further identified the gun that Terry admitted was his as looking like the gun that was used in the robbery. Further, Officer Manning's testimony established that Terry was connected to Raglin, whose fingerprints were found on the cellphones that were recovered shortly after the crime. And although there may have been some differences from what Officer Neal

17

said the witnesses told him the night of the robbery and what was testified to, the differences were not substantial.

{¶45} Beyond that, while there were some inconsistencies in the testimony generally—namely over whether Terry aimed the gun at Matthew and which individual came into the kitchen to pat down Matthew and Zachary and take their belongings— these inconsistencies were pointed out to the jury by defense counsel to be considered in their deliberations.

{¶46} "[I]t is the role of the jury to determine the weight and credibility of evidence." *State v. Hess*, 4th Dist. Meigs No. 20CA1, 2021-Ohio-1248, ¶ 16, citing *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132. " ' "A jury, sitting as the trier of fact, is free to believe all, part, or none of the testimony of any witness who appears before it." ' " *Id.*, quoting *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17. "We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." *Id.*, citing *Reyes-Rosales* at ¶ 17, and *State v. Koon*, 4th Dist. Hocking No. 15CA17, 2016-Ohio-416, ¶ 18.

{¶47} Based on the record before us, we cannot determine that Terry's convictions were not supported by sufficient evidence or against the manifest weight of the evidence. Consequently, we overrule the third and fourth assignments of error.

### IV. Conclusion

{¶48} For all the forgoing reasons, we overrule the assignments of error and affirm the judgment of the trial court.

Judgment affirmed.

CROUSE and WINKLER, JJ., concur.

Please note:

       The court has recorded its own entry this date.